**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2939
_____

UNITED STATES OF AMERICA

v.

MICHAEL FREE,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Crim. No. 2-14-cr-00019-001)
District Judge:  Honorable Mark R. Hornak
_____

Argued July 12, 2016

Before:  FUENTES,[*] SHWARTZ, and RESTREPO, *Circuit
Judges*

_____

  [*] The Honorable Julio M. Fuentes assumed Senior Status on
July 18, 2016.

(Opinion Filed: October 6, 2016)

Martin A. Dietz, Esq. **[ARGUED]**
The Mitchell Building
304 Ross Street, Suite 505
Pittsburgh, PA 15219

*Attorney for Appellant*

Rebecca R. Haywood, Esq.
Laura S. Irwin, Esq. **[ARGUED]**
Office of the United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

*Attorneys for Appellee*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

This case raises the question of how to calculate "loss" under the Sentencing Guidelines when a defendant commits bankruptcy fraud but all of his creditors receive payment in full.

The defendant, Michael Free, made the bizarre

decision to file for bankruptcy even though he had more than sufficient assets to pay his debts. He then, having filed for bankruptcy unnecessarily, hid assets worth hundreds of thousands of dollars from the Bankruptcy Court. Free's actions eventually led to criminal charges and convictions for multiple counts of bankruptcy fraud. The oddity of this entire situation is best summarized by the fact that, despite all of Free's prevarications, his creditors received 100 cents on the dollar from Free's bankruptcy estate.

The Sentencing Guidelines increase a fraudster's recommended sentence based on the amount of loss he causes, or intends to cause, to his victims. The District Court therefore had to decide whether Free caused or intended to cause any loss at all. Recognizing the novelty of the situation, the District Court chose to treat the estimated value of the assets that Free concealed from the Bankruptcy Court and the amount of debt sought to be discharged as the relevant "loss" under the Guidelines.[1] In doing so, the District Court did not clearly find whether Free intended to deprive his creditors of this, or of any, amount. While we appreciate the District Court's reasoning, we ultimately conclude that treating the value of Free's concealed assets as "loss," at least on the rationale articulated by the District Court, is out-of-step with the structure of the Guidelines and inconsistent with our own precedent. Instead, the District Court must determine whether Free intended to cause a loss to his creditors or what he sought to gain from committing the crime, per *United States v. Feldman*, 338 F.3d 212, 221-23 (3d Cir. 2003). A loss amount triggering enhancements under

---

[1] App. Vol. V at 1123.

the Sentencing Guidelines on resentencing must reflect a loss amount incurred or which Free intended to be incurred.[2] However, even if the District Court finds no such intended loss, this is not to say that Free would necessarily receive a lower sentence on remand. Free's repeated lying to the Bankruptcy Court and his manifest disrespect for the judicial system may well merit an upward departure or variance from the Guidelines. The District Court may consider whether such an upward departure is appropriate.

For the reasons that follow, we will vacate the judgment of the District Court and remand this case for resentencing.

## I.      Background

### A.      Free's Bankruptcy Proceedings

Free filed a voluntary bankruptcy petition in July of 2010 in his capacity as the sole proprietor of Electra Lighting & Electric Company, one of the businesses he owns. He also owns Freedom Firearms, a company that specializes in the sale of rare WWII-era guns. After Free fell behind on payments on two business-related properties, the lender purchased them in foreclosure, and Free purportedly filed for

---

[2] *Feldman*, 338 F.3d at 215 ("The determination of actual loss is relevant to the sentencing enhancement, since loss under the Sentencing Guidelines is the greater of the actual loss caused by the defendant's illegal actions or the amount of loss the defendant intended to cause."). Thus, the Guidelines' enhancements treat actual and intended loss on par.

bankruptcy in an effort to "stay" the sale and "possibly to work out an agreement with" the lender.[3]

Filing a bankruptcy petition requires a debtor to complete several forms. These include "Schedule A," which requires an accounting of the debtor's real estate assets, and "Schedule B," which requires an accounting of the debtor's personal property. A debtor certifies that both documents are correct under penalty of perjury. On Free's Schedule A, he disclosed over $1.3 million in real estate assets.[4] On Free's

[3] App. Vol. V at 1107, 1160; Free Br. at 4 ("S&T Bank began foreclosure proceedings against two business properties owned by Appellant, Michael Free. . . . Because he feared that he would lose his business due to the foreclosure actions and the subsequent sheriff's sales, Mr. Free, through counsel, filed a Chapter 13 bankruptcy petition . . . ."). However, the District Court did not make a factual finding accepting Free's and his counsel's assertion that he filed bankruptcy for this reason. *See* App. Vol. V at 1123 ("The Court draws the inference that Mr. Free had his reasons for both filing and persisting in the bankruptcy proceeding, [and] that Mr. Free had his reasons that were of value to him in not causing any of his lawyers to attempt to resolve the matter earlier . . . ."). The District Court in fact found Free's testimony wanting. *See* App. Vol. V at 1125 ("The Court had the opportunity to observe Mr. Free's testimony in Court today, at the time of sentencing, and the Court found, essentially, none of it to be credible at all.").

[4] App. Vol. IV at 904. Free listed a secured claim against one of those assets in the amount of $303,251. *Id.*

5

Schedule B, he listed $368,990 worth of personal property, including 27 firearms collectively valued at $250,000.[5] The District Court later concluded that, at the time he filed for bankruptcy, Free had liabilities of approximately $671,166, meaning that his disclosed assets exceeded his debts by several hundred thousand dollars.[6]

Free initially filed for bankruptcy under Chapter 13 of the Bankruptcy Code, which permits a debtor to reorganize his or her debts.[7] The Bankruptcy Court later converted

---

[5] *Id.* at 905-910.

[6] The District Court did not make a factual finding as to Free's actual net worth at the time he filed for bankruptcy, which remains somewhat mysterious given the extent of Free's fraud on the Bankruptcy Court. Given that Free and the government plainly disagree about the relevant calculations, we decline to venture our own estimate here.

[7] *See, e.g.*, *In re Schaitz*, 913 F.2d 452, 453 (7th Cir. 1990) ("Chapter 13 provides, for individuals, a counterpart to Chapter 11 of the Bankruptcy Code, which authorizes the reorganization of bankrupt enterprises in lieu of their liquidation. Instead of the trustee's seizing and selling the bankrupt's nonexempt assets, as in a Chapter 7 proceeding, under Chapter 13 (as under Chapter 11) the bankrupt proposes a plan for the repayment of his debts out of future income.").

Free's proceeding into a Chapter 7 action,[8] meaning that the focus shifted from "confirmation and completion of a reorganization plan"[9] to "liquidation of assets and distribution to creditors."[10] In a Chapter 7 case, "the United States Trustee appoints an impartial case trustee to administer the case and liquidate the debtor's nonexempt assets."[11] The trustee in this case was James Walsh,[12] an attorney based in Johnstown, Pennsylvania.

One of the events that occurs early in a Chapter 7

---

[8] Order, *In re Michael J. Free d/b/a Electra Lighting & Elec. Co.*, No. 2-10-bk-25460 (CMB), ECF No. 71 (Bankr. W.D. Pa. Jan. 31, 2011) (hereinafter "*Free Bankruptcy*," with ECF filing dates in parentheses). The Court converted the proceeding after Free failed to file a payment plan. *Id.*; Proceeding Memorandum, *Free Bankruptcy*, ECF No. 70 (Jan. 31, 2011).

[9] *In re Michael*, 699 F.3d 305, 306 n.1 (3d Cir. 2012).

[10] *Id.* at 306.

[11] *In re Messina*, 687 F.3d 74, 79 (3d Cir. 2012); *see also* 2 Bankruptcy Law Manual § 10:9 (5th ed. updated through 2016) (explaining that, in a Chapter 7 case "where there are assets for distribution to creditors . . . the trustee serves as the representative of the estate aggressively looking for ways to maximize assets that can be distributed to unsecured creditors").

[12] Notice of Appointment of Interim Trustee and Determination of Trustee Bond, *Free Bankruptcy*, ECF No. 75 (Feb. 2, 2011).

proceeding is a creditors' meeting. During Free's creditors' meeting, which took place in March of 2011, Free indicated that he was "trying to" sell weapons he owned by "put[ting] them on the internet."[13] Walsh immediately told Free to stop:

> Trustee Walsh: You can't sell them, they're now the bankruptcy estate's and only I can sell them with the court approval. So do not, under any circumstances, sell any of these weapons. Don't sell any of the real estate, don't sell any of the inventory. It's all within the control of the court at this point in time.
>
> Michael J. Free: Ok, at least at this point, from my understanding though, is [sic] a moot point because none of the firearms have been sold as of yet.
>
> Trustee Walsh: Yeah, but I'm just . . .
>
> Michael J. Free: I understand[.]
>
> Trustee Walsh: So there's no misunderstanding of "I didn't know", nothing can be sold or transferred without court approval brought on a motion by myself. Ok?

---

[13] App. Vol. V at 977 (Tr. of Mar. 2, 2011 creditors' meeting).

8

Michael J. Free: Alright[.][14]

Over the course of the ensuing months, Free became increasingly uncooperative with Walsh and progressively more disrespectful towards the Bankruptcy Court. Less than a month after the creditors' meeting, Walsh asked the Bankruptcy Court to compel Free to turn over certain assets and to cease operation of his businesses, both of which Free had refused to do.[15] On another occasion, Free raised suspicions by purchasing several of his own assets during a court-supervised auction, falsely claiming that he had the money to do so through the generosity of friends and relatives. In fact, Free actually made such purchases with the proceeds of his surreptitious sales of weapons, after he had specifically been told he could not sell his weapons.[16] Free

---

[14] *Id.*

[15] Trustee's Compl. to Compel Turnover of Property of the Bankruptcy Estate, *Free Bankruptcy*, ECF No. 98 (Mar. 30, 2011).

[16] App. Vol. II at 239–40 (discussing Free having purchased his own properties at auction); App. Vol. III at 447–48 ("I [Walsh] said: Where's this money coming from? And [Free's] response was in open court on the record that it was coming from his family and friends."). *See also* Order Confirming Sales of Personal Property Free and Divested of Liens, *Free Bankruptcy*, ECF No. 134 (July 20, 2011) (indicating that Free purchased over $30,000 worth of inventory, including $8,500 worth of gun parts and ammunition).

also refused to cooperate with Walsh's efforts to obtain paperwork that was necessary to sell the firearms that Free had disclosed in Schedule B of his bankruptcy petition.[17]

Convinced that Free had concealed assets and violated court orders, Walsh filed a motion for sanctions in October of 2011.[18] The Bankruptcy Court granted Walsh's motion in February of 2012, ordering Free to provide a full accounting of his assets or face monetary penalties.[19] The Bankruptcy Court also threatened to incarcerate Free if he failed to comply.[20] In doing so, it expressed its profound frustration with Free's conduct:

---

[17] *In re Free*, 466 B.R. 48, 55 (Bankr. W.D. Pa. 2012).

[18] Mot. for Finding of Civil Contempt, Imposition of Sanctions, for Authority to "Junk" Assets, and Request for Expedited Hearing, *Free Bankruptcy*, ECF No. 180 (Oct. 17, 2011).

[19] *In re Free*, 466 B.R. at 61.

[20] *Id.* at 62 ("If the Court is convinced that compliance can be obtained only by incarceration, we will not hesitate to order the Debtor to be taken into custody.").

> [Free] has acted willfully, vexatiously,
> wantonly, and in bad faith. His inappropriate
> conduct has negatively impacted the entire
> bankruptcy case. . . . [He] has persisted in his
> willful misconduct despite the attempts of three
> bankruptcy judges to dissuade him from future
> misconduct. The failure to cooperate and
> comply while [Free] is facing sanctions for civil
> contempt is shocking to the Court.[21]

Events finally came to a head a few weeks later when Walsh filed an emergency motion for civil contempt.[22] Walsh claimed that Free had, in various ways, failed to comply with the Bankruptcy Court's February 2012 orders. In particular, Walsh said that he had recently been contacted by a man who had tried to purchase a WWII-era firearm from Free for a price of $13,500. The man told Walsh that Free had sold other firearms since entering Chapter 7 proceedings.[23] Walsh responded by asking the Bankruptcy Court to enter an order directing a third-party auction company "to take physical possession of [Free's guns] as

---

[21] *Id.* at 56.

[22] Emergency Mot. for Finding of Civil Contempt, Imposition of Sanctions, for Authority for Liquidator to Take Possession of Weapons, Status Report, and Request for Expedited Hearing, *Free Bankruptcy*, ECF No. 291 (Mar. 19, 2012).

[23] *Id.* at 4–5.

soon as possible."[24]

The Bankruptcy Court convened a hearing on the matter, after which it entered an order directing the local sheriff "to take possession of all of [Free's] firearms."[25] A few days later, on March 26, 2012, Free filed a declaration with the Bankruptcy Court in which he claimed, again under penalty of perjury, that he had not "sold or transferred" any estate assets—including firearms—since his bankruptcy case was converted into a Chapter 7 proceeding.[26] By the time Free filed his declaration, the government claims that he had sold at least 20 firearms worth more than $400,000.[27]

Local sheriff's deputies, acting on the Bankruptcy Court's order, searched Free's house on March 27, 2012—the day after Free filed his declaration with the Bankruptcy Court. They found 49 guns in various locations throughout

---

[24] *Id.* at 6.

[25] Order at 2, *Free Bankruptcy*, ECF No. 303 (Mar. 23, 2012).

[26] Decl. of Michael J. Free, *Free Bankruptcy*, ECF No. 314 (Mar. 26, 2012).

[27] App. Vol. II at 180 (in which Walsh testified that Free "had purported to sell guns to third parties and had collected substantial sums of money from those third parties for the guns"); App. Vol. V at 958–65 (summarizing evidence of Free's gun sales between February 2011 and March 2012).

the home.[28] When they questioned Free, he said he had no additional firearms in his possession.[29] Later that afternoon, Free filed a revised declaration with the Bankruptcy Court that included a handwritten list of dozens of firearms, along with a copy of the Schedule B from his original bankruptcy petition.[30] Because Free did not list any serial numbers in these two documents, Walsh was unable to determine the degree of overlap between the two lists.[31]

The depth of Free's fraud on the Bankruptcy Court became increasingly apparent in the ensuing months. In April of 2012, Walsh filed a status report in which he informed the Bankruptcy Court that Free "ha[d] received at least $90,000.00 in funds from third parties whom he offered to sell firearms which constitute property of the estate during the pendency of this Chapter 7 proceeding."[32] The day after Walsh filed his status report, the Bankruptcy Court ordered the United States Marshal to take Free into custody until such

---

[28] App. Vol. III at 518; *see also* App. Vol. V at 1166–69 (Westmoreland County Sheriff's Office Confiscation Forms from Mar. 27, 2012 search of Free's home).

[29] App. Vol. III at 486 (testimony of Deputy Sheriff Alex Turcheck).

[30] Submission Pursuant to Orders of the Court Dated Feb. 27, 2012 & Mar. 23, 2012, *Free Bankruptcy*, ECF No. 315 (Mar. 27, 2012); *see also* App. Vol. V at 943–49 (same).

[31] App. Vol. II at 184–89.

[32] Status Report of Chapter 7 Trustee Dated Apr. 2, 2012 at 6, *Free Bankruptcy*, ECF No. 330 (Apr. 2, 2012).

time as he paid over $26,000 in fines and rent then owing to the Bankruptcy Court and to the estate.[33]

It was around this time that the FBI became involved. Having reviewed certain firearms registration records, FBI agents came to believe that Free was continuing to conceal firearms from the Bankruptcy Court.[34] The FBI obtained a warrant to search Free's residence a second time. During that search, which took place in March of 2013, federal agents discovered an additional 55 firearms.[35]

## B.  Free's Criminal Prosecution

Federal prosecutors eventually initiated a criminal case against Free for committing bankruptcy fraud. The grand jury returned an indictment in January of 2014 that charged Free with six counts relating to (i) false statements in Free's Schedule A relating to real property; (ii) false statements in Free's Schedule B relating to his ownership of firearms; (iii) false statements in Free's declaration of March 26, 2012; (iv) false statements in Free's supplemental declaration of March 27, 2012; (v) concealment of additional assets from the Bankruptcy Court, including real property, motor vehicles, farm implements, and cash; and (vi) false statements that Free made under oath at the March 2011 creditors' meeting.[36]

---

[33] Order at 2, *Free Bankruptcy*, ECF No. 337 (Apr. 3, 2012).

[34] App. Vol. III at 518–19.

[35] *Id.* at 532-35, 539.

[36] App. Vol. II at 1–8.

Counts I through IV arose under 18 U.S.C. § 157, which outlaws various forms of bankruptcy fraud.[37] Counts V and VI arose under 18 U.S.C. § 152, which makes it a crime to conceal assets or to commit perjury in the context of a bankruptcy proceeding.[38] Both statutes set a

---

[37] 18 U.S.C. § 157 states that "[a] person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—

(1) files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;

(2) files a document in a proceeding under title 11; or

(3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,

shall be fined under this title, imprisoned not more than 5 years, or both."

[38] 18 U.S.C. § 152 has nine subsections. Count V, which related to the concealment of assets, charged Free with violating subsections (1) and (2). Subsection (1) makes it unlawful to "knowingly and fraudulently conceal[] from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor." Subsection (2) makes it unlawful to "knowingly

maximum term of imprisonment of five years for each violation.

After a five-day trial, a jury convicted Free on all counts.

### C.      Free's Sentencing Hearing

Under the Sentencing Guidelines, a bankruptcy fraudster's recommended term of imprisonment depends on a number of factors.[39]   "Section 2B1.1 of the Guidelines governs the calculation of the offense level for crimes involving, among other things, fraud and deceit."[40] Subsection (a) of that provision "provides the base offense level, which is either seven, if the offense has a maximum term of imprisonment of twenty years or more, or six."[41]

and fraudulently make[] a false oath or account in or in relation to any case under title 11."  Count VI, which related to false statements made at the March 2011 creditors' meeting, was brought under subsection (2) alone.

[39] The District Court relied on the 2014 edition of the Sentencing Guidelines, as do we.  *See* Gov't Br. at 19 n.2.

[40] *United States v. Nagle*, 803 F.3d 167, 179 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 1238 (2016).  The current § 2B1.1 of the Guidelines incorporates provisions previously located at § 2F1.1.  That section "was deleted and consolidated with § 2B1.1 in 2001." *United States v. Dullum*, 560 F.3d 133, 138 (3d Cir. 2009).

[41] *Nagle*, 803 F.3d at 179.

16

Subsection (b) "provides an extensive list of adjustments for offense-specific characteristics," including "the adjustment for the amount of loss."[42]  As the loss amount increases, so too does the defendant's offense level.

At Free's sentencing hearing, the District Court therefore needed to make a determination as to the amount of loss caused by Free's crimes.  The issue here is that, by the time of Free's sentencing, it had become clear that Free had (and perhaps always had) sufficient assets to pay off his creditors in full.  Given this odd factual posture, the parties disputed the correct loss amount under the Guidelines.

The government argued that the District Court should take at least three numbers into account to calculate loss, all relating to the value of Free's concealed guns.  First, it identified fifteen firearms, valued at $357,460, that Free unlawfully sold during the pendency of his bankruptcy proceedings.[43]  Second, it pointed to the fact that, at an auction supervised by the Bankruptcy Court, ten additional guns concealed by Free were sold for $640,000 (although, by the date of the sentencing hearing, that sale had not yet been finalized).  Third, it asked the District Court to consider an additional cache of guns that had not yet been sold at auction and remained in the FBI's possession.  Based on an appraisal

---

[42] *Id.*

[43] App. Vol. V at 1048.  The District Court pointed out that Free presumably used the proceeds from these sales to buy his own assets back during certain court-supervised auctions. *See id.* at 1053–54.

17

from the same buyer who purchased the second lot of guns, the government estimated the value of the unsold lot at $833,000. Altogether, these figures indicated that Free concealed firearms worth approximately $1.83 million from the Bankruptcy Court.

Free's counsel objected to the $833,000 figure on the ground that the government produced its appraisal estimate at the last minute and he had not yet had a chance to investigate the appraiser's credentials. The District Court sustained the objection and discounted the $833,000 figure in its calculations.

Even so, the government argued that Free should have 16 levels added to his offense level. It derived this figure from the Sentencing Guidelines' stepwise scheme for calculating loss. If a fraudster's conduct causes over $400,000 but less than $1 million in loss, the Guidelines add 14 levels to his offense level.[44] If the fraudster's conduct causes over $1 million but less than $2.5 million in loss, the Guidelines add 16 levels to his offense level.[45] Thus, even if the District Court were disinclined to credit the $833,000 figure as the correct valuation for Free's as-of-yet-unsold guns, the value of the first two groups of guns was $997,640. The government asserted that, whatever its value, the third lot of guns was worth enough to push Free's loss figure past the $1 million threshold necessary to trigger a 16-level increase

---

[44] U.S.S.G. § 2B1.1(b)(1)(H).

[45] *Id.* § 2B1.1(b)(1)(I).

18

in his offense level.[46]

Free's position, by contrast, was that he "should only be held accountable for a loss amount that's consistent with what he could have deprived creditors of receiving back during the bankruptcy."[47]  Since all of Free's creditors were paid back in full, Free asserted that the loss amount in his case was, in fact, $0.

In a colloquy with Free's counsel, the District Court challenged Free's arguments in favor of a $0 loss calculation. It pointed out that courts rely on honesty from litigants:

---

[46] App. Vol. V at 1064 ("That's the only argument I'm making, Judge.  That to the extent the Court considers dollar value of relevance, we are way past the million dollar threshold for whatever consideration the Court wants to give to that fact.").

[47] *Id.* at 1070.

But then, as I thought about it, read Feldman, one of the things that we rely on people doing is, when they come to Court, whether it's this Court or the Bankruptcy, particularly, the Bankruptcy Court, they have to deal the cards faced up, because we don't have a cavalry of investigators to go out snooping around everyone that runs through the tens of thousands of bankruptcy cases just filed here in Pittsburgh, let alone around the country. We absolutely rely on people telling the truth because we can't ferret it out any other way.[48]

In addition, the District Court expressed the view that, under the Guidelines, there is a difference between a debtor who conceals $100 in assets and a debtor who conceals $1 million in assets. According to the District Court, the Guidelines reflect a policy judgment that the second debtor should receive a harsher sentence than the first.[49] Free's counsel disagreed. He argued that the Guidelines are concerned primarily with the amount of harm inflicted or intended to be inflicted on victims of crime. And here, the only conceivable victims were Free's creditors—who, it turned out, sustained no loss at all.[50]

---

[48] *Id.*

[49] *Id.* at 1082 ("[A]ren't the Sentencing Guidelines permitted and for the reasons making [sic] distinctions between people that hide a lot and people that don't hide very much?").

[50] *Id.* at 1072.

Walsh, the bankruptcy trustee, also testified at Free's sentencing hearing. He said that Free's dishonesty was the worst he had ever seen in his more than 37 years of practice in the bankruptcy courts.[51] In his view, "at virtually every single step of the way . . . Free has been an obstructionist."[52] But Walsh also testified that, once Free's bankruptcy proceedings had concluded, there would likely be more than enough assets to satisfy all creditors' claims.[53]

Free also spoke on his own behalf. He claimed that he filed for bankruptcy in order to "stay [a] sheriff sale" on one of his properties, not to discharge any debts.[54] He also said that his bankruptcy attorney told him that it would be acceptable not to disclose all of his firearms on his bankruptcy schedules.[55]

The District Court made two key statements regarding its loss calculation. First, it concluded that "it was certainly Mr. Free's intention to conceal from the United States Bankruptcy Court and to cause a loss, to the extent that it was

---

[51] *Id.* at 1092.

[52] *Id.* at 1091.

[53] *Id.* at 1096.

[54] *Id.* at 1107, 1109 (in which Free stated that he told his lawyer that he "wanted everybody paid, right from the beginning," and "did not want any kind of a write-off or anything").

[55] *Id.* at 1108–09.

21

needed, materially in excess of a million dollars."[56]   The District Court did *not*, however, explicitly state that Free intended to cause pecuniary harm to his creditors.  Nor did the District Court clarify its understanding of Free's intent at the time he filed for bankruptcy.  Instead, the District Court made the following statement:

> The Court draws the inference that Mr. Free had his reasons for both filing and persisting in the bankruptcy proceeding, [and] that Mr. Free had his reasons that were of value to him in not causing any of his lawyers to attempt to resolve the matter earlier . . . .  But all of the testimony at the trial . . . demonstrates that Mr. Free knew and wanted to be in the bankruptcy proceeding, that he, he viewed assets that he needed to protect from the bankruptcy proceeding, and combined with those that he did disclose in the bankruptcy proceeding were well north of a million dollars.[57]

In explaining its loss calculation, the District Court stated that it "found . . . none of [Free's testimony] to be credible at all," and said that Free's answers were "evasive" and "non-sensible."[58]  The District Court underscored its view that the Guidelines reflect the commonsense proposition "that

---

[56] *Id.* at 1122.

[57] *Id.* at 1123.

[58] *Id.* at 1125.

there would be a higher loss calculation when there is a significantly higher amount of assets that are concealed from the Bankruptcy Court, even if on reflection it could have been completely unnecessary from a logical and a common sense standpoint to conceal [them]."[59]  The District Court also characterized the victim of Free's fraud as "the judicial system of the United States," not his creditors.[60]

Somewhat curiously, even though the District Court concluded that the loss amount in Free's case was more than $1 million, it only added 14 levels to Free's base offense level of 6.  That 14-level enhancement is consistent with a loss amount of between of between $400,000 and $1 million,[61] whereas a loss amount greater than $1 million normally triggers a 16-level enhancement.[62]  The discrepancy appears to have arisen because the Presentence Investigation Report only recommended a 14-level enhancement, and the District Court tentatively adopted that recommendation before Free's sentencing hearing[63] and then adhered to its prior decision at the hearing itself.[64]

---

[59] *Id.* at 1126.

[60] *Id.* at 1140.

[61] U.S.S.G. § 2B1.1(b)(1)(H).

[62] *Id.* § 2B1.1(b)(1)(I).

[63] App. Vol. V at 984.

[64] *Id.* at 1045 ("The Court will adopt its tentative findings as they have been corrected on the record today . . . .").

In addition to the 14-level enhancement resulting from the District Court's loss calculation, the Guidelines state that "[i]f the offense involved . . . a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding," or "a violation of any prior, specific judicial or administrative order," the district court should "increase [the offense level] by 2 levels."[65] The District Court applied this 2-level enhancement as well.[66]

Combining Free's base offense level of 6, his loss causation enhancement of 14, and his 2-level enhancement for bankruptcy fraud, Free's total offense level was 22. This resulted in a Guidelines Range of 41–51 months' imprisonment on each count.[67] The District Court then varied downward, concluding that an offense level of 16 was "more appropriate" given the facts of Free's case.[68] This led to a Guidelines range of 21–27 months' imprisonment.[69] The District Court ultimately sentenced Free to 24 months' incarceration on each count, to run concurrently, and to a term of supervised release of three years.[70]

---

[65] U.S.S.G. § 2B1.1(b)(9)(B), (C). Under this provision, the defendant's offense level increases to 10 if it is not that high already. In this case, Free's offense level was already 20, leading only to the 2-level enhancement.

[66] App. Vol. V at 1127–28.

[67] *Id.* at 1128.

[68] *Id.* at 1143.

[69] *Id.*

[70] *Id.* at 1145.

## D.     Free's Motion for Bail Pending Appeal

About a month after his sentencing, Free filed a motion for bail pending appeal.  Free argued that bail was appropriate because our Court might ultimately agree with his view of how to calculate loss under the Guidelines.  The District Court granted the motion three months later, concluding that Free had raised a "significant" question of law.[71]

The District Court reiterated that, "[b]ased on the record developed at trial and at sentencing, it does not appear that any creditor will suffer any financial loss at all, and all administrative expenses of the bankruptcy will be paid, with some assets left over."[72]  The District Court also adhered to the view, previously articulated at Free's sentencing hearing, that "the Sentencing Guidelines reflect[] a policy position that the sentence should be greater when one attempts to conceal greater assets in a bankruptcy proceeding—even when the actual pecuniary harm to the creditors, viewed in hindsight, was less than the amount concealed."[73]  Thus, while "Free's deceit plainly harmed the integrity of the judicial process—and this Court articulated that *as the principal basis for the sentence imposed*—it did not, however, appear to actually cause pecuniary harm [to] his creditors or anyone other than,

---

[71] *United States v. Free*, No. 2:14-CR-0019 (MRH), 2015 WL 8784738, at *2 (W.D. Pa. Dec. 15, 2015) (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)).

[72] *Id.*

[73] *Id.* at *3.

25

perhaps, him."[74]

Importantly, the District Court concluded that the loss calculation issue could alter Free's sentence. It noted that, without the 14-level increase in Free's offense triggered by its prior loss calculation, Free's offense level would have been 10, "lead[ing] to an advisory Guideline range of 6–12 months."[75] Even though this Guidelines range would not be binding, the District Court stated that it was entitled to "due and serious consideration."[76] And, while the District Court was "hesitant to engage in any concrete forecast of what would actually happen at a resentencing,"[77] it also stated that it was "'likely' . . . that a new sentence [would] be shorter than 11–13 months if Mr. Free's 'zero' loss theory [were to] carr[y] the day."[78]

Accordingly, Free has been out on bail pending resolution of this appeal.

---

[74] *Id.* at *2 (emphasis added).

[75] *Id.* at *5; *see also supra* note 65 (explaining that U.S.S.G. § 2B1.1(b)(9) increases a bankruptcy fraudster's minimum offense level to 10).

[76] *Free*, 2015 WL 8784738, at *5 (citing *United States v. Langford*, 516 F.3d 205, 211–15 (3d Cir. 2008)).

[77] *Id.* at *6 n.11.

[78] *Id.* at *6.

## II. Jurisdiction and Standards of Review

This is a direct appeal from a criminal conviction and sentence. Free timely filed a notice of appeal, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Free brings both a challenge to the sufficiency of the evidence and a challenge to his sentence. "In reviewing a jury verdict for sufficiency of the evidence, we 'must consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt.'"[79]

In a fraud case, the government bears the burden of establishing the amount of loss for purposes of sentencing by a preponderance of the evidence.[80] When calculating the loss amount, a district court "need only make a reasonable estimate of the loss" incurred.[81] We review a district court's factual findings at sentencing for clear error, including factual findings supporting "the loss calculations . . . under

---

[79] *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993) (quoting *United States v. Frorup*, 963 F.2d 41, 42 (3d Cir. 1992)).

[80] *United States v. Fumo*, 655 F.3d 288, 310 (3d Cir. 2011), *as amended* (Sept. 15, 2011) (citing *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008)).

[81] *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007) (quoting U.S.S.G. § 2B1.1, app. n. 3(C)).

Guidelines § 2B1.1."[82]  Alternatively, "[w]hen the calculation of the correct Guidelines range turns on an interpretation of 'what constitutes loss' under the Guidelines, we exercise plenary review."[83]

## III.    Discussion

Free challenges both the sufficiency of the evidence and the District Court's subsequent sentence.  We will consider each issue in turn.

### A.    Sufficiency of the Evidence

With respect to the sufficiency of the evidence, Free's primary contention is that, since his creditors received full payment as a result of his bankruptcy proceedings, he cannot properly be said to have devised or participated in any fraudulent scheme.  While Free admits that his dishonesty may have been "potentially contemptible conduct in the bankruptcy matter," he insists that his repeated lying does not necessarily "establish [the] requisite mens rea [to show] that he devised a scheme to defraud or intended to defraud anyone."[84]  This argument is too clever by half.

Free was convicted of four counts under 18 U.S.C. § 157.  "One commits bankruptcy fraud under § 157 by (1) devising a scheme to defraud, and (2) filing a document in a

---

[82] *Dullum*, 560 F.3d at 137.

[83] *Nagle*, 803 F.3d at 179 (quoting *Fumo*, 655 F.3d at 309).

[84] Free Br. at 27.

bankruptcy proceeding or making [a] false or fraudulent statement in relation to the bankruptcy proceeding for the purpose of executing or concealing the fraudulent scheme."[85] There is ample evidence from which a reasonable jury could have concluded that Free did precisely that. What's more, no fraudulent losses need to occur for a debtor to violate § 157; "[f]iling itself is the forbidden act."[86] Whatever else Free did, the evidence that he filed fraudulent documents with the Bankruptcy Court is overwhelming.

Likewise, counts V and VI involve violations of 18 U.S.C. §§ 152(1) and 152(2). We have said that a debtor violates § 152(1) by failing to "reveal the existence of his assets to the United States Trustee."[87] And, by its plain terms, § 152(2) outlaws "knowingly and fraudulently mak[ing] a false oath" in relation to a bankruptcy case.[88] Here again, the evidence of Free's guilt is indisputable.

More generally, Free's argument depends on the proposition that debtors have blanket immunity to lie to the Bankruptcy Court so long as there are no creditors who suffer any out-of-pocket losses. Free points us to no authority for

---

[85] *United States v. Knight*, 800 F.3d 491, 505 (8th Cir. 2015).

[86] *United States v. DeSantis*, 237 F.3d 607, 613 (6th Cir. 2001).

[87] *United States v. Brennan*, 326 F.3d 176, 199 (3d Cir. 2003).

[88] 18 U.S.C. § 152(2).

such a remarkable proposition, and we are confident in rejecting it.

## B. The Proper Loss Calculation in the Present Case

We turn next to Free's challenge to his sentence, and in particular to his contention that the District Court erred in its calculation of "loss" under the Sentencing Guidelines.

There are essentially two ways to think about loss in this case. Under one view, the goal of the Sentencing Guidelines is to calibrate a fraudster's punishment so that it reflects the extent of the economic harm inflicted or intended to be inflicted on the fraudster's victims. This is Free's position. Free argues that there were no victims here because Free's creditors received 100 cents on the dollar in Free's bankruptcy proceeding.

Under the alternative view proffered by the government, the Guidelines provide district courts with broad discretion to conceptualize the harm caused by a defendant based on the facts of any particular case. In the context of bankruptcy fraud, then, it is appropriate to think about harm in terms of the value of any assets that a debtor conceals from the bankruptcy court—not only because concealing assets can harm creditors, but also because it harms the integrity of the judicial system itself. The District Court ultimately embraced

this view.[89]

We begin with the Sentencing Guidelines themselves, which we think favor Free's argument. The application notes define the following key terms:

- **Actual loss:** "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

- **Intended Loss:** "Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

---

[89] The District Court wrote that "[w]hile Free's deceit plainly harmed the integrity of the judicial process—and this Court articulated that as the principal basis for the sentence imposed—it did not, however, appear to actually cause pecuniary harm [to] his creditors or anyone other than, perhaps, him." *Free*, 2015 WL 8784738, at *2 (second alteration added).

- **Pecuniary harm:** "Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.[90]

In our view, the application notes to § 2B1.1, which discuss these definitions in further detail, suggest that the District Court's rationale for Free's sentence was inconsistent with the structure of the Guidelines.[91] The notes focus extensively on *pecuniary* harm, explicitly stating that the proper way to punish a defendant who causes *non-pecuniary* but otherwise serious harm is to impose an upward

---

[90] U.S.S.G. § 2B1.1, app. n. 3(A)(i), (ii), (iii) (punctuation modified). The current sentencing guidelines, as revised in 2015, narrows "intended loss" to "pecuniary harm that the defendant purposely sought to inflict," while still including intended pecuniary harm that would have been impossible or unlikely to occur.

[91] We have said that "the Sentencing Guidelines commentary 'is akin to an agency's interpretation of its own legislative rules[,]' [and] we will give the application notes 'controlling weight' unless the commentary 'violate[s] the Constitution or a federal statute[]' or 'is plainly erroneous or inconsistent with the regulation.'" *United States v. Lianidis*, 599 F.3d 273, 278 (3d Cir. 2010) (all alterations in original except second) (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)).

departure.[92]  This guidance implies that the gravamen of any loss calculation is concrete, monetary harm to a real-world victim.  In other words, while it may indeed be appropriate to punish a bankruptcy fraudster more severely when that person conceals assets of greater value, the Guidelines seem to indicate that, in the absence of any pecuniary harm to a victim, the mechanism for realizing that goal is an upward departure rather than a more severe loss calculation in the first instance.

Our Court's leading case regarding loss calculation and bankruptcy fraud is *United States v. Feldman*.[93]  The defendant there, like Free, committed fraud on the bankruptcy court by concealing large quantities of assets.[94]  His main argument on appeal, like Free's, focused on the lack of any concrete harm or intended pecuniary harm to his creditors. Feldman claimed that because most of his concealed assets consisted of property he owned jointly with his wife that, by operation of law, was not subject to execution by his creditors, his decision to hide those properties from the

---

[92] U.S.S.G. § 2B1.1, app. n. 20(A) ("There may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense.  In such cases, an upward departure may be warranted.").  One of the proffered examples where an upward departure might be merited is a case where "[t]he offense caused or risked substantial non-monetary harm."  *Id.* app. n. 20(A)(ii).

[93] 338 F.3d 212 (3d Cir. 2003).

[94] *Id.* at 214 ("Feldman filed a bankruptcy petition in which he vastly understated the amount of property he owned.").

bankruptcy court inflicted little or no actual loss within the meaning of the Guidelines.[95]

The *Feldman* Court began its analysis by observing that loss calculations under the Guidelines can turn on either actual loss or intended loss. Thus, "even if Feldman could not have caused any loss by concealing exempt assets, he could still be subject to a sentencing enhancement if he *thought* he would cause a loss by concealing the assets."[96] The government, by contrast, urged the *Feldman* Court to go even further by adopting "a bright line rule that '[i]ntended loss includes the value of assets concealed from creditors and the bankruptcy court.'"[97] We declined to do so, stating that the key question in these cases is not the value of the assets concealed, but rather "what [a defendant] sought to gain from committing the crime."[98]

The *Feldman* Court recognized that a reasonable sentencing court could credit Feldman's argument that he "did not intend any monetary loss to his creditors."[99] But

---

[95] *Id.* at 215. The district court in *Feldman* declined to decide if the real estate that the defendant owned with his wife was *actually* exempt from bankruptcy, "reasoning instead that Feldman lost the right to claim the exemption when he failed to disclose the property." *Id.*

[96] *Id.* at 221 (emphasis in original).

[97] *Id.* at 221–22 (alteration in original).

[98] *Id.* at 223.

[99] *Id.*

*Feldman* also stated that it would be "appropriate for the District Court to consider the reason why most people would conceal assets and determine that it is simply unbelievable that Feldman would hide over a million dollars in assets only [as he argued on appeal] to achieve a faster discharge."[100] Whereas Feldman had argued that the government needed to affirmatively rebut his contention that he concealed assets only "to 'speed along' the [bankruptcy] process,"[101] we "conclude[d] that intent [to short-change creditors] can be inferred from the fact that Feldman concealed a large amount of property."[102]

Importantly, however, we did not say in *Feldman* that the concealment of large quantities of assets *always* proves a fraudster's intent to short-change his creditors. Instead, we emphasized that there were other facts tending to show that Feldman *in particular* intended to inflict such a loss. We emphasized that, in addition to the real estate he owned with his wife, Feldman concealed two Jaguar vehicles "that were not even arguably exempt from bankruptcy."[103] In our view, this conduct supported the conclusion "that Feldman intended to inflict a loss in the amount of the entire debt from which he sought to be discharged."[104]

---

[100] *Id.*

[101] *Id.* at 222.

[102] *Id.* at 216.

[103] *Id.* at 223–24.

[104] *Id.* at 223.

35

The parties disagree over how *Feldman* applies to the facts at hand. Free contends that *Feldman* supports him because it focuses on a debtor's intended pecuniary harm to creditors. The government, by contrast, says that *Feldman* supports its view that district courts have wide discretion to consider "the many permutations of facts that arise when loss is at issue" and to assess "what the defendant 'sought to gain from committing the crime.'"[105] The government argues that, "[h]ad Free truly not intended a loss to any creditor, he had many opportunities to come forward, admit to his fraud and deceit, and set the record straight."[106] The government therefore urges us to interpret Free's continued dishonesty as evidence that, as a matter of law, supports the conclusion that Free intended loss equal to the amount of debt that he sought to conceal.

The District Court, however, seemed to select a different approach and thus did not make a factual finding regarding the government's view. The government, both in its briefing and at oral argument, argues that the District Court drew the explicit inference that Free intended to cause *pecuniary harm* to his creditors, among other victims.[107]

---

[105] Gov't Br. at 55 (quoting *Feldman*, 338 F.3d at 223).

[106] *Id.* at 56 (internal quotation marks omitted).

[107] For example, the section heading for Part III.C.2 of the government's brief states: "The District Court Correctly Ruled, As A Matter Of Law, That Free Intended A Loss." Gov't Br. at 55. It is worth noting that no citations to the record or to the District Court's statements at Free's sentencing hearing appear in that section of the brief.

36

Reviewing the record on appeal, we simply disagree. The District Court relied primarily on the notion that Free harmed the judicial system by concealing assets. We believe that rationale is inconsistent with the Guidelines and incompatible with *Feldman*. Thus, we disagree with the District Court's view that the concept of "loss" under the Guidelines is broad enough to cover injuries like abstract harm to the judiciary. In our view, "loss" has a narrower meaning—i.e., pecuniary harm suffered by or intended to be suffered by victims.

The government's citations to cases from other circuits on this point are not persuasive. While courts have occasionally treated the value of concealed assets as the amount of loss in bankruptcy fraud cases, they have done so in circumstances where it was clear that the debtor would be

Likewise, counsel for the government began her oral argument by stating: "The question before the Court today is whether the District Court correctly found Michael Free intended and thought that his conduct would cause an injury—cause a financial injury—to his creditors. The District Court said 'yes,' and that decision was correct." Oral Arg. Recording at 13:29, available at http://www2.ca3.uscourts.gov/oralargument/audio/15-2939USAvFree.mp3. Having carefully scrutinized the District Court's statements at sentencing, and its opinion regarding Free's motion for bail pending appeal, we are not so certain that the District Court made such a finding.

unable to pay all of his creditors in full.[108] These cases *might* support the government's view if, at the time Free filed for bankruptcy, it was clear that Free's liabilities exceeded his assets, or if Free had concealed so many assets that the creditors were at risk of not being paid.[109] But the District Court did not make such a finding.

Instead, we draw guidance from our colleagues in the Seventh Circuit. That court recently recognized that "the guidelines do not require a loss calculation greater than zero."[110] Rather, "[t]he loss determination is a special offense characteristic that increases the guidelines offense level" through "bonus punishment points, which express a reasonable estimation of the victim's financial loss."[111] We agree with the proposition that the government is not entitled

---

[108] *See, e.g.*, *United States v. Walker*, 29 F.3d 908, 913 n.4 (4th Cir. 1994) (noting that "the claims of Walker's creditors totalled [sic] $3,444,191 while only $17,111 ultimately was distributed to two creditors after liquidation").

[109] *See, e.g.*, *United States v. Hughes*, 401 F.3d 540, 557 (4th Cir. 2005) ("The district court observed that at the time of the concealment it was far from clear that there would be sufficient assets to pay the creditors in full . . . . On that basis, the district court calculated the amount of intended loss as the value of the assets concealed by Hughes . . . .").

[110] *United States v. Yihao Pu*, 814 F.3d 818, 828 (7th Cir. 2016).

[111] *Id.* at 828–29 (citation and internal quotation marks omitted).

to a punitive loss calculation, even in cases involving fraud, absent evidence of actual or intended pecuniary loss.

It is true that the District Court stated at Free's sentencing hearing "that it was certainly Mr. Free's intention to conceal from the United States Bankruptcy Court and to cause a loss, to the extent that it was needed, materially in excess of a million dollars."[112] However, the District Court also stated, somewhat cryptically, that "Free had his reasons for both filing and persisting in the bankruptcy proceeding, [and] that Mr. Free had his reasons that were of value to him in not causing any of his lawyers to attempt to resolve the matter earlier."[113]

In our view, this is something short of an explicit factual finding that Free intended to harm his creditors by concealing assets. It is, at most, a finding that Free wanted to protect certain assets—especially his firearms—from the bankruptcy process. In any event, we do not think that the District Court actually made an explicit factual finding as to whom Free intended to harm or the gain he intended to secure

---

[112] App. Vol. V at 1122.

[113] *Id*. at 1123.

by committing the offense.[114]  Any ambiguity on this point is clarified by the District Court's opinion regarding Free's motion for bail pending appeal.  The District Court there said that "the *principal basis* for the sentence [it] imposed" was "harm[] [to] the integrity of the judicial process"—not pecuniary harm, actual or intended, to Free's creditors, or what he sought to gain from committing the crime.[115] *Feldman* requires such a factual finding, and we thus remand to allow the District Court to determine what, if any, loss to creditors Free intended, or the gain he sought by committing the crime.[116]

---

[114] At times, the government seems to suggest that we should review the entire record in order to conduct our own fact-finding about whether Free intended to cause pecuniary harm. *See, e.g.,* Gov't Br. at 43 ("The full record, rather than Free's preferred reliance on only parts of the record, establishes that the District Court had before it more than ample evidence to rule, as a matter of fact, that Free intended a loss.").  We decline the government's invitation.  It is true that we will generally not vacate a sentence "if the district court's findings are 'plausible in light of the record viewed in its entirety.'" *United States v. Barrie*, 267 F.3d 220, 223 (3d Cir. 2001) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)).  But here, because we do not think that the District Court actually made an explicit factual finding as to whom Free intended to harm or the gain he sought to secure through the crime, there are no factual findings for us to review under the clear-error standard at all.

[115] *Free*, 2015 WL 8784738, at *2 (emphasis added).

[116] *See Feldman*, 338 F.3d at 221-23.

We of course appreciate the concerns expressed by both the government and the District Court regarding the integrity of the judicial system. U.S.S.G. § 2B1.1(b)(9)(B) reflects, in part, this concern. We also agree with the District Court that it is sensible to punish fraudsters who conceal assets of greater value more harshly than defendants who conceal assets of lesser value. In the vast majority of cases, the loss calculation will have precisely this effect because, generally speaking, the *reason* defendants conceal assets in bankruptcy is to benefit themselves at the expense of their creditors. But here, the District Court has not made a finding as to whether Free had such an intent, and the parties disagree on this point. While we are sympathetic with the District Court's desire to punish Free in a manner commensurate with his disrespect for the judiciary, we nonetheless conclude that inflating Free's loss figure based on a theory of abstract harm to the judiciary is not an appropriate way to calibrate his sentence under the Guidelines.

This is not to say that Free will necessarily receive a lower sentence on remand. It is true that the District Court has already calculated that, if it were to apply a zero-dollar loss figure, the Guidelines range on remand would be 6–12 months on each count.[117] But as we have already noted, the Guidelines embrace the view that an upward departure or variance may be appropriate when a defendant's conduct results in extensive, albeit non-pecuniary, harm.[118] We

---

[117] *Free*, 2015 WL 8784738, at *5.

[118] *See supra* note 92 and accompanying text.

appreciate that the notes speak of non-pecuniary harm in terms of injury to *actual victims*, such as "physical harm, psychological harm, or severe emotional trauma."[119] Free's flouting of the bankruptcy system, his blatant disrespect for judicial authority, and his repeated dissembling while under oath are not analogous to these kinds of injuries. But even at the most general level, the statutory sentencing factors require district courts to consider, among other things, "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."[120] Moreover, the District Court may find it appropriate to depart on the basis that Free's "conduct resulted in a significant disruption of a governmental function" to reflect Free's flagrant disregard for the Trustee's instructions, the Bankruptcy Court's orders, and interference with the bankruptcy process.[121] Free's conduct may therefore be considered in favor of a sentence harsher than the one that would be suggested by the actual loss

---

[119] U.S.S.G. § 2B1.1, app. n. 20(A)(ii).

[120] 18 U.S.C. § 3553(a)(2)(A).

[121] U.S.S.G. § 5K2.7 ("If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected."). *See also United States v. Thayer*, 201 F.3d 214, 228 n.15 (3d Cir. 1999) ("[W]e do not foreclose the district courts' option to depart upward under U.S.S.G. § 5K2.0 in appropriate cases of bankruptcy fraud . . . .").

calculation.[122]

We leave it to the District Court to consider these issues on remand and to determine an appropriate sentence consistent with the statutory sentencing factors and the applicable Sentencing Guidelines.

## IV. Conclusion

For the foregoing reasons, we will vacate the judgment of the District Court and remand this case for resentencing.

---

[122] *Cf. United States v. Lipscomb*, 284 F. App'x 924, 928 (3d Cir. 2008) (affirming an above-Guidelines-range sentence for a bankruptcy fraudster whom the district court characterized as a "serial abuser of the judicial system" and in which the District Court noted that "I'm going to sentence you to a term of imprisonment above the sentencing guideline range because I believe you are outside the ordinary case here."). In addition, the government appeared confident at oral argument that it could show that Free actually *did intend* to cause pecuniary harm to his creditors. *See, e.g.*, Oral Arg. Recording, *supra* note 107, at 14:01 ("As a matter of fact . . . the only reason the creditors were paid 100% on the dollar is because the fraud was discovered and concealed assets were liquidated to pay off those creditors."). Moreover, tangible harm may include administrative expenses that the estate incurred as a result of Free's actions. *See United States v. Edgar*, 971 F.2d 89, 95 (8th Cir. 1992) (deeming it appropriate to consider in the calculation of intended loss "the foreseeable costs of administering the estate").