**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2475
_____

IN RE: GRAND JURY MATTER #3

John Doe,
                                        Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2:14-gj-631-003)
District Judge: Honorable R. Barclay Surrick
_____

Argued: January 12, 2016

Before: McKEE, <u>Chief Judge</u>\*, AMBRO and
SCIRICA, <u>Circuit Judges</u>

(Opinion filed:  January 27, 2017)

_____

\* Judge Theodore McKee concluded his term as Chief of the
United States Court of Appeals for the Third Circuit on September
30, 2016. Judge D. Brooks Smith became Chief Judge on October
1, 2016.

Scott A. Resnik, Esquire    (Argued)
Michael M. Rosensaft, Esquire
Katten Muchin Rosenman LLP
575 Madison Avenue
11th Floor
New York, New York 10022

Karl S. Myers, Esquire
Andrew K. Stutzman, Esquire
Stradley Ronon Stevens & Young
2005 Market Street
Suite 2600
Philadelphia, PA  19103


        Counsel for Appellant

Zane David Memeger, Esquire
Robert A. Zauzmer, Esquire
Joel M. Sweet, Esquire
Mark B. Dubnoff, Esquire (Argued)
Office of the United States Attorney
615 Chestnut St., Suite 1250
Philadelphia, PA 19106

        Counsel for Appellee

PER CURIAM.[1]

---

[1] In response to Appellant John Doe's Petition for *En Banc* Rehearing (which also requests panel rehearing, a

This appeal presents an unusual question of appellate jurisdiction: May we continue to exercise jurisdiction over an appeal of an evidentiary ruling in a grand jury proceeding even after the grand jury has returned both an indictment and a superseding indictment? We conclude that, so long as the grand jury investigation continues, we retain jurisdiction and thus can resolve the controversy.

With jurisdiction, we turn to an important question involving the limits of the exception to the confidentiality normally afforded to attorney work product. It loses protection from disclosure when it is used to further a fraud (hence the carve-out is called the crime-fraud exception). The District Court stripped an attorney's work product of confidentiality based on evidence suggesting only that the client had thought about using that product to facilitate a fraud, not that the client had actually done so. Because an actual act to further the fraud is required before attorney work product loses its confidentiality and we know of none here, we reverse.

## I.

Company A, John Doe, his lawyer, and Doe's business associate are the subjects of an ongoing grand jury investigation into an allegedly fraudulent business scheme.[2] After the Government obtained access to an email Doe claims

presumption in any event under Third Circuit Internal Operating Procedure 9.5.1), the panel grants panel rehearing, vacates its earlier opinion, and issues this opinion.

[2] We use pseudonyms to refer to the grand jury subjects to protect the secrecy of the grand jury investigation and the anonymity of the subjects.

was privileged, it asked the District Court for permission to present it to the grand jury. The Court granted permission, finding that, although the email was protected by the work-product privilege, the crime-fraud exception to that privilege applied. Doe then filed an interlocutory appeal, requesting that our Court reverse the District Court's order.

While the appeal was pending, the grand jury viewed the email in question. It then indicted Doe, his lawyer, and Doe's business associate for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracy to commit fraud, mail fraud, wire fraud, and money laundering. Thereafter the grand jury was discharged and a new grand jury was empaneled. It too saw the disputed email, and in December 2016 returned a superseding indictment that did not contain new charges but revisions to the previous ones. The grand jury investigation, however, continues still. What follows fleshes out this factual and procedural backdrop.

Doe was the sole owner of Company A and its president. Nonetheless a November 2008 document purports to memorialize Doe's sale of 100% of the shares of Company A to Company B for $10,000. Doe's business associate is the sole owner of Company B. Following this purchase agreement, Doe claims that the business associate engaged Doe to be responsible for Company A's day-to-day operations. However, numerous filings and tax documents suggested that Doe maintained control and ownership of Company A even after Doe's stock in it was purportedly transferred.

Over the last decade and a half multiple individuals have sued Doe and his businesses in state courts around the country based on Doe's business practices. One such lawsuit was a class action filed against Company A in Indiana state

4

court. In it the plaintiffs alleged that Company A's business practices violated various Indiana state laws. They sought to hold Doe accountable for these violations. However, during this litigation Doe stated in a deposition in 2014 that he had transferred ownership of Company A to Company B. Doe's business associate then represented that Company A was no longer in business and had limited assets. Shortly after Doe's deposition, the Indiana plaintiffs settled their claims for approximately $260,000, about 10% of the value attorneys for the plaintiffs had put on them.

Thereafter the Government empaneled a grand jury to investigate Doe and his business associate. Its theory is that Doe owned Company A but tricked the plaintiffs into thinking that he had sold it to his business associate to encourage the plaintiffs to settle for a lower value. This relies on the premise that Doe has deep pockets but his business associate does not.

In the course of its investigation, the grand jury subpoenaed Doe's accountant requesting that he provide the Government with Doe's personal and corporate tax returns. Among other things, these tax documents revealed that Doe had claimed 100% ownership of Company A every tax year from 2008 through 2012. The accountant also told an IRS agent that, at some time in 2013, Doe's lawyer informed him that Doe had sold Company A in 2008. He also informed investigators that he might have taken notes on this conversation. The Government requested them, and the accountant's attorney sent the Government three documents.

One of the documents was an email Doe had sent to the accountant on July 16, 2013, forwarding an email that Doe's lawyer had sent to Doe four days earlier that referenced an ongoing litigation. The attorney email advises Doe of the steps he needed to take to correct his records so that they

5

reflect that the business associate, not Doe, owned Company A since 2008. When Doe forwarded this email to his accountant, he simply wrote: "Please see the seventh paragraph down re; my tax returns. Then we can discuss this." There is no evidence that Doe ever amended his returns or did anything else, apart from forwarding the email, to follow up on his attorney's advice. Indeed, the accountant's recollection is that Doe's attorney later said not to go through with the amendments by telling the accountant to "stand by" for further guidance. It never came.

The day after the accountant provided this email to the Government, the accountant's attorney sought to recall it on the ground that it was privileged and had been inadvertently included in his client's production. The accountant's counsel, however, also told the Government that his client believed the email was asking the accountant to perform an accounting service, not a legal service. The Government argued that under these circumstances Doe waived any privilege that might have otherwise attached to his lawyer's email. It did, however, temporarily refrain from presenting it to the grand jury and asked the District Court in January 2015 for permission to do so, which Doe opposed.

The Court ruled in the Government's favor. Its rationale was that Doe did not forward the email to his accountant to seek legal advice. Lacking that precondition, no attorney-client privilege attached to the document. However, the Court did find that the attorney work-product privilege attached to the email because the accountant could not be considered an adversary. It then concluded that the crime-fraud exception to the work-product privilege applied. On this basis, the Government could present the email to the grand jury.

Immediately after the District Court made its decision, Doe filed an interlocutory appeal requesting that we reverse its order. As noted above, while the appeal to our Court was pending the grand jury saw the email and later returned a 17-count indictment charging Doe, his lawyer, and Doe's business associate with RICO conspiracy, conspiracy to commit fraud, mail fraud, wire fraud, and money laundering.

We requested supplemental briefing from the parties on whether Doe's appeal was moot in light of the indictment. We also asked the Government to inform us whether the grand jury had been discharged. In response, it explained that the grand jury had been discharged shortly after it returned the indictment. The Government also informed us that a new grand jury had been empaneled, was investigating new charges against Doe and others, and it was considering a superseding indictment. Accordingly, both Doe and the Government asserted that the appeal was not moot due to the continuing investigation (though the Government still challenged our jurisdiction[3]). We issued an opinion holding that we lacked jurisdiction, and Doe sought rehearing.

---

[3] It argued that the collateral order doctrine does not supply a basis for appellate jurisdiction. We agree. The doctrine allows us to hear an appeal of an interlocutory order that "(1) conclusively determine[s] the disputed question; (2) resolve[s] an important issue completely separable from the merits of the action; and (3) [is] effectively unreviewable on appeal from a final judgment." *Bines v. Kulaylat*, 215 F.3d 381, 384 (3d Cir. 2000) (internal quotation marks omitted). The third requirement cannot be met here because "flawed grand jury proceedings can be effectively reviewed by [our] court and remedied after a conviction has been entered and all criminal proceedings have been terminated in the district court." *See In re Grand Jury Proceedings (Johanson)*, 632

Following the rehearing petition, the Government changed its mind and contends that Doe's appeal is now moot. It has informed us that it showed the disputed email to the new grand jury in September 2016 (before the initial opinion of our panel issued), and the grand jury returned a superseding indictment in December 2016 (after our initial opinion). However, that grand jury is still investigating other charges relating to ownership of Company A, though the Government represents that it currently has no plans to seek additional charges based on the email.

**II.**

This appeal thus presents a novel procedural fact pattern that complicates the issue of our appellate jurisdiction. Generally, courts of appeals have jurisdiction over "final decisions" of the district courts. 28 U.S.C. § 1291. But "[w]hen a district court orders a witness—whether a party to an underlying litigation, a subject or target of a grand jury investigation, or a complete stranger to the proceedings—to testify or produce documents, its order generally is not considered an immediately appealable final decision under § 1291." *See In re Grand Jury (ABC Corp.)*, 705 F.3d 133, 142 (3d Cir. 2012) (internal alterations, citations, and quotation marks omitted). Thus disclosure orders are not final and cannot typically be challenged by an immediate—that is, interlocutory—appeal.

To obtain immediate appellate review of a disclosure order, the order's target must ordinarily comply with what is known as the "contempt rule": he "must refuse compliance, be held in contempt, and then appeal the contempt order." *Id.*

F.2d 1033, 1039 (3d Cir. 1980). As we discuss below, however, a different doctrine confers appellate jurisdiction.

8

at 142-43 (citations and quotation marks omitted). The party may immediately appeal a district court's contempt order because it is a final judgment imposing penalties on the willfully disobedient party in what is effectively a separate proceeding. *Id.* at 143.

However, in *Perlman v. United States*, 247 U.S. 7 (1918), the Supreme Court carved out an exception to the contempt rule. It applies when a "disinterested" third party controls a privilege holder's documents and is ordered to produce them. *See ABC Corp.*, 705 F.3d at 138. Because the third party is unlikely to risk contempt to obtain an immediate appeal, and because the privilege holder may not refuse to obey a court order to which he is not subject, *Perlman* allows the privilege holder to take an immediate appeal. *Id.*

In this context, *Perlman* provided appellate jurisdiction at the beginning of our case. The email before us was produced in response to a subpoena addressed exclusively to Doe's accountant, who "lack[s] a sufficient stake in the proceeding to risk contempt." *Id.* at 145. Indeed, the accountant gave the email to the Government without telling Doe, so Doe was "powerless to avert the mischief."[4] *Id.* at

---

[4] The Government, in opposing rehearing, now argues that *Perlman* does not apply because it already had possession of the document from the accountant and the District Court merely permitted the grand jury to read it. Thus "[n]obody ever faced a threat of contempt." Pet. Reh'r. Opp. at 6. True enough, there was no threat of contempt because Doe never had the opportunity to challenge or prevent the accountant's production to the Government in the first place. But if *Perlman* permits a privilege holder to sue immediately without the threat of contempt in play because that holder cannot himself disobey a disclosure order not directed at him,

9

144 (quoting *Perlman*, 247 U.S. at 13). The Government contends, however, that we should no longer exercise jurisdiction because the first grand jury returned an indictment and the succeeding grand jury returned a superseding indictment.

The grand jury proceedings have yet to conclude, however. On at least two occasions we have continued to exercise jurisdiction even after grand juries returned indictments. In the first case, the Government appealed an adverse ruling on a grand jury subpoena. At the outset of the appeal, our jurisdiction was clear because Congress had specifically given the Government the right to seek immediate review. *See In re Grand Jury Proceedings (Johanson)*, 632 F.2d 1033, 1040 (3d Cir. 1980) (citing 18 U.S.C. § 3731). As the appeal was pending, however, the grand jury returned an indictment. We nonetheless concluded that, as long as the indictment did not render the appeal moot, we had jurisdiction to reach the merits. Because in that case the indictment "did not bring the grand jury's proceedings to [their] conclusion," a live controversy remained and our jurisdiction was intact. *Id.*

The second decision, which involved Congressman Chaka Fattah and was issued less than two years ago, is even more compelling because it, like our case, arose because of *Perlman*. At the time Fattah filed his *Perlman* appeal, he was, like Doe, being investigated by a grand jury. Just as in our case, his status changed when the grand jury, after oral arguments in our Court but before we reached a decision, returned an indictment. *See In re Search of Elec. Commc'ns in the Account of chakafattah@gmail.com at Internet Serv.*

---

the lack of a contempt threat here does not take this principle out of play.

*Provider Google, Inc.*, 802 F.3d 516, 521 n.2 (3d Cir. 2015) ("*Fattah*"). However, because his appeal related to the still-ongoing review of his emails (thus giving us a live controversy), we continued to exercise jurisdiction per *Perlman* even after the indictment. *Id.* at 529–30.

Sound judicial efficiency concerns underlie our *Johanson* and *Fattah* decisions and weigh in favor of continuing to exercise jurisdiction even post-indictment. When we are able to dismiss an appeal for lack of jurisdiction as soon as it is filed, the process continues uninterrupted in the trial court, and we are able to wait until all the appellate issues are wrapped up after a final judgment. But because in limited circumstances we take pre-indictment appeals and begin to decide them, we should not reflexively dismiss those appeals—wasting the parties' effort as well as ours—simply because an indictment is filed. Instead, if grand jury proceedings continue, we may still exercise jurisdiction in order to remedy future harm.

Consider our case, which has been on our docket since June 2015. By the time Doe was indicted nearly ten months had passed, and the parties had fully briefed the case and presented oral arguments to us. If we then send the case back to the District Court on the rationale that our jurisdiction was pulled by the indictment, we would do so with it likely that the issue would return if there is a conviction. And if Doe is convicted and files an appeal, the parties will need to re-brief and re-argue the same issue that we could have resolved already. Thus in cases where we accept an appeal when it is filed, efficiency favors finishing what we started.

To be sure, an intervening indictment can (and often will) moot an interlocutory appeal. For instance, through this appeal Doe asks us to prevent the grand jury from relying on an email that he argues is confidential. If after the indictment

the grand jury investigation had ended, any harm from exposure to the email already would have occurred. It would make sense in those circumstances to hold off until after the criminal proceedings are over before determining whether the grand jury proceeding were tainted.

But those are not our facts. The grand jury investigation continues, even after the new grand jury saw the email and issued a superseding indictment. Although the Government contends that the "grand jury easily can continue investigating questions relating to the ownership of [Doe's company] without reexamining the email or considering any charges related to the email," it may yet return another indictment based on the issue of the company's ownership— the very subject of that email. Gov't 28(j) Letter (Dec. 29, 2016). The grand jury cannot erase from its memory an email about Company A's ownership while evaluating new charges relating to that issue. And though the Government contends it currently "has no plans" to put this email to further use during the continuing investigation, there is no guarantee that its plans will not change. Pet. Reh'g Opp'n at 4. Therefore, in our case, as in *Johanson*, these two indictments "did not bring the grand jury's proceedings to [their] conclusion," so there is still potential harm we can prevent. *Johanson*, 632 F.2d at 1040. The purpose of this appeal thus remains the same as when it was first filed: deciding whether an email that was inadvertently disclosed may be used as part of an ongoing grand jury investigation when that disclosure plausibly violates the attorney work-product privilege.

As long as we had jurisdiction at the outset, Doe's case is guided by our analysis of the Government's appeal in *Johanson* and by our decision in *Fattah*. As in those cases, the indictment and superseding indictment did not destroy

12

jurisdiction that properly existed beforehand.[5] If the controversy is live enough that the case is not moot, we should decide it.

### III.

Having concluded that our appellate jurisdiction continues, we now address the merits and hold that the crime-fraud exception to the attorney work-product doctrine does not apply to the email at issue. One of the exception's two requirements—the use of the communication in furtherance of a fraud—is lacking. The use-in-furtherance requirement provides a key safeguard against intrusion into the attorney-client relationship, and we are concerned that contrary reasoning erodes that protection.

Without the crime-fraud exception allowing the Government to show it to the grand jury, the email from Doe's lawyer is protected by the attorney work-product doctrine. That doctrine (often referred to as a privilege from or exception to disclosure), which is a complement to the attorney-client privilege, preserves the confidentiality of legal

---

[5] The Government also contends this appeal is moot for an unrelated reason. It argues that Doe has waived attorney-client protections because his pretrial memorandum indicates that he might rely on the advice-of-counsel defense. *See Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 164 (3d Cir. 2010) (recognizing that attorney-client confidentiality protections may be waived if the client asserts a defense based on his reasonable reliance on the attorney's advice) (citation omitted). We disagree. That Doe's trial strategy has changed given the development of this case does not mean he has waived the issues he continues to challenge on appeal.

communications prepared in anticipation of litigation. Shielding work product from disclosure "promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Westinghouse Elec. Corp. v. Republic of Phil.*, 951 F.2d 1414, 1428 (3d Cir. 1991). Though Doe waived the attorney-client privilege by forwarding the email to his accountant, the document still retained its work-product status because it was used to prepare for Doe's case against those suing him. *See id.*

Yet work-product protection, though fundamental to the proper functioning of the legal system, is not absolute. As relevant here, the crime-fraud exception operates to prevent the perversion of the attorney-client relationship. It does so by allowing disclosure of certain communications that would otherwise be confidential. "[A] party seeking to apply the crime-fraud exception must demonstrate that there is a reasonable basis to suspect (1) that the [lawyer or client] was committing or intending to commit a crime or fraud, and (2) that the . . . attorney work product was used in furtherance of that alleged crime or fraud." *ABC Corp.*, 705 F.3d at 155.

The Government can readily satisfy the first requirement. Though ultimately it will be up to a jury to determine whether Doe committed fraud, there is at least a reasonable basis to believe he did. Even setting aside the email, the Government has a recording where Doe allegedly brags about defrauding the class action plaintiffs in the Indiana suit. He purportedly admits in that recording to telling his associate—the same one who was supposed to have already purchased Company A—"I'll pay you ten grand a month if you will step up to the plate and say that you [own the company] and upon the successful completion of the lawsuit [I'll] give you fifty grand."

14

This evidence is strong, but it is not sufficient by itself to pierce the work-product protection. We have been clear that "evidence of a crime or fraud, no matter how compelling, does not by itself satisfy both elements of the crime-fraud exception." *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011). Rather, the second requirement—use in furtherance—exists for the same reason that certain conspiracy statutes require proof that a defendant engaged in an overt act to further the crime. In both settings we want to make sure that we are not punishing someone for merely thinking about committing a bad act. Instead, as Justice Holmes noted in the conspiracy context, we ask for evidence that the plan "has passed beyond words and is [actually] on foot." *Hyde v. United States*, 225 U.S. 347, 388 (1912) (Holmes, J., dissenting).

To illustrate, if a client approaches a lawyer with a fraudulent plan that the latter convinces the former to abandon, the relationship has worked precisely as intended. We reward this forbearance by keeping the work-product protection intact. If, by contrast, the client uses work product to further a fraud, the relationship has broken down, and the lawyer's services have been "misused." *In re Grand Jury Investigation*, 445 F.3d 266, 279 (3d Cir. 2006). Only in that limited circumstance—misuse of work product in furtherance of a fraud—does the scale tip in favor of breaking confidentiality.

Here the only purported act in furtherance identified by the District Court was Doe forwarding the email to his accountant. If he had followed through and retroactively amended his tax returns, we would have no trouble finding an act in furtherance. Even if Doe had told the accountant to amend the returns and later gotten cold feet and called off the plan before it could be effected, there might still be a case to be made. That is because the Government "does not have to

15

show that the intended crime or fraud was accomplished, only that the lawyer's advice or other services were misused." *Id.* (quoting *In re Public Defender Serv.*, 831 A.2d 890, 910 (D.C. 2003)).

But none of that happened. Doe merely forwarded the email to the accountant and said he wanted to "discuss" it. There is no indication he had ever decided to amend the returns, and before the plan could proceed further the lawyer told the accountant to hold off. Thus Doe at most thought about using his lawyer's work product in furtherance of a fraud, but he never actually did so. What happened is not so different than if Doe merely wrote a private note, not sent to anyone, reminding himself to think about his lawyer's suggestion. The absence of a meaningful distinction between these scenarios shows why finding an act in furtherance here lacks a limiting principle and risks overcoming confidentiality based on mere thought.

The District Court gave two reasons for its conclusion that Doe used his lawyer's work product in furtherance of a fraud. First, it suggested that Doe, in forwarding the email to his accountant, "took [his lawyer's] advice" about amending the tax returns. J.A. 16. It is not clear what the Court meant by this because, as it acknowledged, Doe "never followed through with amending" the returns. *Id.* Second, the Court said that the failure to follow through "is of no consequence" as long as Doe intended, as of the time he forwarded the email, to amend the returns. *Id.* This is no doubt an accurate statement of the law. *See ABC Corp.*, 705 F.3d at 155. The problem is that there is simply no record evidence suggesting that Doe had ever made up his mind.

None of this should suggest that, in the event Doe is convicted (based on the superseding indictment) and appeals, he should automatically get a new trial because the

16

Government used the protected work product. That is because the Government could avoid a retrial by showing the error was harmless. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–56 (1988). We express no opinion on that question.

*　　*　　*　　*　　*

Many appeals involving grand jury proceedings will become moot after the return of an indictment. But the presence of a new grand jury that is continuing to investigate even after issuing a superseding indictment makes this case out-of-lane. As a live controversy remains, an indictment does not automatically preclude us from deciding it. When we do so, we conclude that the crime-fraud exception to the attorney work-product privilege does not apply to the email at issue. We therefore reverse the decision allowing the breach of that privilege.