NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-2282 & 18-2539
_____

UNITED STATES OF AMERICA

v.

WHEELER K. NEFF,
              Appellant in No. 18-2282
_____

UNITED STATES OF AMERICA

v.

CHARLES M. HALLINAN,
              Appellant in No. 18-2539
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Nos. 2-16-cr-00130-001 & 2-16-cr-00130-002
District Judge: Honorable Eduardo C. Robreno


Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 27, 2019

Before: CHAGARES, GREENAWAY, JR., and GREENBERG, Circuit Judges.

(Filed: September 6, 2019)

_____

OPINION[*]
_____

CHAGARES, <u>Circuit</u> <u>Judge</u>.

Charles Hallinan and Wheeler Neff were convicted of conspiring to collect unlawful debts in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), federal fraud, and other crimes. Their RICO convictions are based on their efforts to skirt state usury laws by partnering with American Indian tribes to offer usurious payday loans. And their fraud convictions are based on their defrauding consumers who sued one of Hallinan's payday businesses into settling their case for a fraction of its worth. They now appeal their convictions and sentences on numerous grounds. We will affirm.

I.

We write for the parties and so recount only the facts necessary to our decision.

Payday loans are a form of short-term, high-interest credit, commonly due to be repaid with the borrower's next paycheck. The loans are not termed in interest rates, but rather in fixed dollar amounts. The borrower is required to pay this amount — termed a fee — in order to secure the loan and is charged this amount each time the borrower misses the due date to pay off the loan. As a result of this cycle, the annual percentage

_____

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

rates (APR) on payday loans are exceedingly high:  400% for loans made through brick-and-mortar shops on average, and 650% for those made through the internet.  Seventeen states outright prohibit these types of loans by capping the allowable APR on consumer loans at 36% or less.  Twenty-seven regulate these loans by imposing licensing requirements, limiting the size of the loans or the number of renewals, or by structuring APR limits to a cap that would not all but assure the prohibition of these loans.  And only six states permitted unlicensed payday lending to their residents during the indictment period.

Hallinan has been partnering with Indian tribes to offer payday loans since 2003.  In 2008, after a falling out with his first tribal partner, Hallinan joined up with Randall Ginger, a self-proclaimed "hereditary chief" of a Canadian Indian tribe.  They met through Neff, an attorney who previously worked with Ginger and a different payday lender.  In late 2008, Neff drafted contracts by which Hallinan sold one of his companies, Apex 1 Processing, Inc., to a sole proprietorship owned by Ginger — although none of Apex 1's operations changed and Ginger never actually became involved in them.

In March 2010, Apex 1 was sued in a class action in Indiana for violating various state consumer-credit laws.  The plaintiffs sought over $13 million in statutory damages ($2,000 for five violations apiece against over 1,300 class members).  Through Neff, Hallinan hired an attorney to defend Apex 1.

Hallinan and Neff replaced Ginger with the Guidiville tribe, a federally recognized Indian tribe based in the United States, in late 2010.  In 2011, they also introduced the tribe to Adrian Rubin, Hallinan's former payday-lending business partner, and Neff

drafted agreements to facially transfer Rubin's payday loan portfolio to the tribe while Rubin continued to provide the money for the loans and the employees to collect on them. From 2010 until 2013, Hallinan used new entities associated with this tribe to issue and collect debt from payday loans to borrowers across the county (including hundreds with Pennsylvania residents) all of which had three-figure interest rates.

In July 2013, soon after the class was certified in the Indiana lawsuit, Neff sent Hallinan an email warning him that he faced personal liability of up to $10 million if the plaintiffs could prove that he did not really sell Apex 1 to Ginger. Neff advised: "[T]o correct the record as best we can at this stage, and present Apex 1 as owned by Ginger as intended, it would be helpful if [your accountant] could correct your tax returns and remove the reference to [Apex 1] on the returns and re-file those returns." Joint Appendix ("JA") 6890. He continued:

> Also, for settlement discussion purposes, it's important that Apex 1 not be doing any further business other than maintaining a minimum net worth. For that reason, if there is any business being done through Apex 1, it would be very helpful to have all such activity discontinued and retroactively transferred to another one of your many operating companies for the entire 2013 year. All that will tend to confirm that Ginger owned Apex 1 and there are only a minimal amount of assets available for settlement . . . .

Id. Hallinan forwarded this email to his accountant and wrote: "Please see the seventh paragraph down re; my tax returns. Then we can discuss this." JA 6889.

So Hallinan called Ginger and said, "I'll pay you ten grand a month if you will step up to the plate and say that you were the owner of Apex One Processing, and upon the successful conclusion of the lawsuit, I'll give you fifty grand." JA 6391. Hallinan also falsely testified in a deposition that: Apex 1 went out of business around 2010, he

4

sold Apex 1 to Ginger in November 2008, he became vice president after the sale and only made $10,000 a month, he resigned from Apex 1 in 2009 and stopped receiving payments, and he did not pay Apex 1's legal fees. As Neff wrote in a later email, the goal was "to avoid any potential questioning . . . as to any deep pockets or responsible party associated with Apex 1." JA 7066. In April 2014, the plaintiffs settled the Indiana lawsuit for $260,000, which Hallinan paid through one of his payday-lending companies.

Later in 2014, the Government empaneled a grand jury to investigate Hallinan and Neff's payday-lending scheme, as well as their conduct in the Indiana class action (and Ginger's as well). As part of the investigation, the Government served subpoenas for documents on Apex 1's attorneys in the Indiana case. They produced some documents but withheld or redacted others as privileged communications with their client, Apex 1. When the grand-jury judge held that any privilege was held by Apex 1, not Ginger, Ginger and Hallinan hired attorney Lisa A. Mathewson to represent Apex 1 and assert its privilege. Ginger signed Mathewson's engagement letter as Apex 1's "authorized representative," while Hallinan signed an agreement to pay Mathewson for her representation. Over the course of two years, Hallinan paid Mathewson over $400,000 to represent Apex 1 in the grand-jury investigation.

The Government also served document subpoenas on Hallinan's accountant. Among other documents, he produced the July 2013 email from Neff that Hallinan had forwarded to him. The Government moved to present this email to the grand jury. The district court concluded that the email was protected attorney work product but allowed it to be presented to the grand jury under the crime-fraud exception. Hallinan filed an

5

interlocutory appeal to this Court. We held that the crime-fraud exception did not apply since no actual act to further the fraud had been performed. In re Grand Jury Matter #3, 847 F.3d 157 (3d Cir. 2017).

The grand jury indicted Neff and Hallinan and later returned a seventeen-count superseding indictment. The first two counts charged them with RICO conspiracy to collect unlawful debt in violation of 18 U.S.C. § 1962(d). Counts three through eight charged them with defrauding and conspiring to defraud the Indiana plaintiffs, in violation of 18 U.S.C. §§ 371, 1341, 1343. Counts nine through seventeen charged Hallinan with money laundering in violation of 18 U.S.C. § 1956(a)(2)(A).

Before trial, the Government moved in limine to admit the July 2013 email. The Government's motion was based on the argument that the July 2013 email had furthered certain tax crimes, not the fraud that this Court considered, and so it was admissible under the crime-fraud exception despite this Court's earlier decision. After a hearing at which Hallinan's accountant testified, the District Court agreed and granted the motion.

Trial took place in the fall of 2017 over ten weeks. Neff testified extensively over the course of four days, including about the sources he consulted regarding the legality of tribal payday lending. The District Court did not permit him to testify about the details of those sources or to introduce them into evidence, however. Hallinan and Neff were convicted on all counts in November 2017.

In 2018, after a bench trial, the District Court ordered forfeiture of certain assets of both defendants. Hallinan was ordered to forfeit over $64 million in proceeds of the RICO enterprise as well as the funds in eighteen bank accounts and three cars as a part of

6

his interest in the RICO enterprise. Neff was ordered to forfeit his legal fees obtained from his participation in the RICO enterprise and a portion of his interest in his residence that corresponded with the home office in which he facilitated the conspiracies.

Then the District Court sentenced the defendants. As to Hallinan, the court calculated his total offense level to be 36, resulting in a Guidelines range of 188–235 months of imprisonment, which included a two-level enhancement for obstruction of justice. That enhancement was due to Hallinan's hiring of Mathewson to make privilege assertions on behalf of Apex 1 in the grand jury investigation. The court then granted a two-level downward departure based on Hallinan's age and poor health, and varied down one more level under 18 U.S.C. § 3553(a), resulting in a final offense level of 33 and a Guidelines range of 135–168 months of imprisonment. The court sentenced Hallinan to 168 months of imprisonment followed by three years of supervised release.

As to Neff, the Presentence Report set his offense level for the fraud charges at level 39, which included a 20-level upward adjustment for an intended loss amount exceeding $9.5 million. See U.S.S.G. § 2B1.1(b)(1)(K). That adjustment was based on his July 2013 email to Hallinan that set the risk of the Indiana lawsuit at $10 million. But the court instead applied a loss amount of $557,200, the amount of a settlement offer extended to the Indiana plaintiffs in December 2013. The court then varied downward from the Guidelines range of 121–151 and sentenced Neff to 96 months of imprisonment followed by three years of supervised release.

This timely appeal followed.

II.[1]

Hallinan and Neff challenge their convictions and sentences on nine distinct grounds. Both defendants challenge (A) the admission of the July 2013 email at trial; (B) the mens rea jury instruction; (C) the limit on Neff's testimony; and (D) whether they defrauded the Indiana plaintiffs of "property" under the mail and wire fraud statutes. Neff alone challenges (E) the tribal-immunity jury instruction; (F) the sufficiency of the evidence against him; and (G) the loss calculation at his sentencing. Hallinan alone challenges (H) his obstruction-of-justice enhancement and (I) his forfeiture and money judgment. We address these issues in turn.

A.

We begin with the admission of the July 2013 email at trial. The District Court admitted this email under the crime-fraud exception to attorney work-product privilege. The crime-fraud exception applies when "there is a reasonable basis to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communication or attorney work product was used in furtherance of that alleged crime or fraud." In re Grand Jury, 705 F.3d 133, 155 (3d Cir. 2012). The District Court determined that "there is a reasonable basis to suspect that (1) the defendants were committing or intended to commit tax crimes, and (2) the email was used in furtherance of those crimes," and that this Court's earlier decision did not "foreclose the possibility that the email was used in furtherance of a different crime or

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

fraud." U.S. Supp. App. 129. "We review the District Court's determination that there is sufficient evidence for the crime-fraud exception to apply for an abuse of discretion." In re Grand Jury Subpoena, 745 F.3d 681, 691 (3d Cir. 2014).

This determination was not an abuse of discretion. The evidence suggested that Hallinan's sale of Apex 1 to Ginger was a sham and that Hallinan continued to own and operate the company. After the July 2013 email, however, Hallinan ceased declaring this ownership on his taxes and ceased having his accountant file tax returns for Apex 1. This is the "actual act to further the [crime]" that we found lacking before. In re Grand Jury Matter #3, 847 F.3d at 160; see 26 U.S.C. § 7203 (prohibiting willfully failing to file a return); id. § 7206(1) (prohibiting willfully filing a return that the taxpayer "does not believe to be true and correct as to every material matter"). There is reason to suspect that the July 2013 email precipitated those acts, since it instructs Hallinan to "present Apex 1 as owned by Ginger." JA 6890. Although Hallinan took a different tack than Neff recommended, he nonetheless "used [this advice] to shape the contours of conduct intended to escape the reaches of the law." In re Grand Jury Subpoena, 745 F.3d at 693; see also In re Grand Jury, 705 F.3d at 157 ("All that is necessary is that the client misuse or intend to misuse the attorney's advice in furtherance of an improper purpose.").

The law-of-the-case doctrine does not compel a different result. Even if we conclude that the doctrine applies — that is, that this issue was either expressly or by implication decided in a prior appeal, In re City of Phila. Litig., 158 F.3d 711, 718 (3d Cir. 1998) — any error is harmless. Far from the "lynchpin" of the Government's case, all this email showed was that Hallinan and Neff acknowledged the risk the Indiana

9

lawsuit posed and were motivated to mitigate it. The substantial sums that Hallinan paid to carry out the mitigation effort alone suffice as other evidence from which this fact could be gleaned.

B.

We turn next to the District Court's mens rea jury instruction. Both Neff and Hallinan argue that the District Court should have instructed the jury that their conduct must have been willful, not merely knowing. The difference is that the term "knowing" requires "only that the act be voluntary and intentional and not that a person knows that he is breaking the law," United States v. Zehrbach, 47 F.3d 1252, 1261 (3d Cir. 1995), while "willful" requires that the defendant knew that his conduct was unlawful, see, e.g., United States v. Starnes, 583 F.3d 196, 210–11 (3d Cir. 2009). Since the defendants raised this objection at trial, our review is plenary. United States v. Waller, 654 F.3d 430, 434 (3d Cir. 2011).

"The RICO statute itself is silent on the issue of mens rea . . . ." Genty v. Resolution Tr. Corp., 937 F.2d 899, 908 (3d Cir. 1991). "When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct." Elonis v. United States, 135 S. Ct. 2001, 2010 (2015) (quotation marks omitted). Some statutes require a mens rea of willfulness to separate wrongful from innocent conduct, but for others, "a general requirement that a defendant act knowingly is itself an adequate safeguard." Id. Compare, e.g., Liporata v. United States, 471 U.S. 419, 425 (1985) (holding that a statute prohibiting the unauthorized possession or use of

10

food stamps required the defendant to know that his conduct was unauthorized), with Carter v. United States, 530 U.S. 255, 269 (2000) (holding that a statute prohibiting taking items from a bank "by force and violence" does not require willfulness because "the concerns underlying the presumption in favor of scienter are fully satisfied" by proof of a taking at least by force), and United States v. Int'l Minerals & Chem. Corp., 402 U.S. 558, 564–65 (1971) (concluding that a statute that criminalized the violation of a regulation regarding transportation of corrosive liquids only required a showing of knowledge and not willfulness in part because a company that is engaged in business involving significant risks to the public should know of the regulations applying to its business).

A conviction for conspiring to collect unlawful debt does not require willfulness to distinguish innocent from guilty conduct. Collecting an unlawful debt, like "a forceful taking," necessarily "falls outside the realm of the 'otherwise innocent.'" Id. at 270. Reasonable people would know that collecting unlawful debt is unlawful. Moreover, those engaged in the business of debt collection, whose risks to the public are all too familiar, should be aware of the laws that apply to them, particularly laws determining an aspect as essential as how much interest they can charge. The Government therefore need prove only that a defendant knew that the debt collected "had the characteristics that brought it within the statutory definition of" an unlawful debt. Staples v. United States, 511 U.S. 600, 602 (1994). The District Court did not err by declining to give a willfulness instruction.

11

## C.

Next we consider the defendants' challenge to the limit that the District Court imposed on Neff's testimony. The District Court permitted Neff to testify about the legal sources he consulted concerning the legality of tribal lending, but not to testify about the details of those sources or to introduce them into evidence. "We review the District Court's decisions as to the admissibility of evidence for abuse of discretion." United States v. Serafini, 233 F.3d 758, 768 n.14 (3d Cir. 2000).

This limitation was not an abuse of discretion. Testimony about what Neff reviewed goes to his good-faith defense — whether he honestly believed that the debt was lawful because of tribal sovereign immunity. But Neff wanted to prove more — that tribal immunity did make the debts lawful — and thus to refute the District Court's instruction to the contrary. Such efforts to convince the jury that the court had the law wrong "would usurp the District Court's pivotal role in explaining the law to the jury." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006). The District Court rightly limited Neff's efforts to contest its legal explanations before the factfinder.

Basically conceding that the District Court's ruling was not an abuse of discretion, Neff and Hallinan claim instead that their constitutional right to "a meaningful opportunity to present a complete defense . . . must take precedence over an otherwise applicable evidentiary rule." Neff Br. 37; see Hallinan Br. 44–52. The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984). "This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or

12

disproportionate to the purposes they are designed to serve." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotation marks and brackets omitted). But the Constitution permits courts "to exclude evidence that . . . poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" Crane v. Kentucky, 476 U.S. 683, 689–90 (1986) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)); see also Holmes, 547 U.S. at 314 ("[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."). The District Court's limitation was not irrational or arbitrary, but was justified by the risk that Neff's testimony would confuse or mislead the jury about the law, which the District Court is tasked with explaining.

D.

We turn to Neff and Hallinan's last joint argument: that an unvested cause of action is not a property right protected by the federal fraud statutes. Since they failed to raise this point before the District Court, we review it only for plain error. See United States v. Gonzalez, 905 F.3d 165, 182 (3d Cir. 2018). "Under plain error review, we require the defendants to show that there is: (1) an error; (2) that is 'clear or obvious'; and (3) that 'affected the appellants' substantial rights.'" Id. at 182–83 (quoting United States v. Stinson, 734 F.3d 180, 184 (3d Cir. 2013)). "If those three prongs are satisfied, we have 'the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial

13

proceedings.'" Stinson, 734 F.3d at 184 (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)).

The federal mail and wire fraud statutes require that an individual intended to defraud someone of "money or property." 18 U.S.C. §§ 1341, 1343. The Supreme Court has held that these statutes are "limited in scope to the protection of property rights." McNally v. United States, 483 U.S. 350, 360 (1987). "[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right." United States v. Henry, 29 F.3d 112, 115 (3d Cir. 1994).

We do not see a plain error with applying the fraud statutes here. The Supreme Court has upheld fraud convictions based on schemes to defraud victims of "[t]he right to be paid money," which "has long been thought to be a species of property." Pasquantino v. United States, 544 U.S. 349, 356 (2005). In Pasquantino, the Court held that a country's "right to uncollected excise taxes" is "an entitlement to collect money," the possession of which is "property" within the meaning of the wire fraud statute. Id. at 355–56. Along those lines, we recently held that the right to the uncollected fines and costs associated with unadjudicated traffic tickets — claims that a motor-vehicle-code violation has taken place — constituted "a property interest." United States v. Hird, 913 F.3d 332, 339–45 (3d Cir. 2019). An unadjudicated civil cause of action is sufficiently similar under plain-error review. Black's Law Dictionary defines "cause of action" as "a factual situation that entitles one person to obtain a remedy in court from another person." Black's Law Dictionary (11th ed. 2019). An entitlement to a remedy is like an

14

entitlement to money (the most common remedy). In addition, the Supreme Court has held that "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982); see also Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 313 (1950). While Neff argues that "[t]hese cases speak of 'property' in the unique context of the 14th Amendment," Neff Reply 22–23, he never explains why they do not still illuminate "whether the law traditionally has recognized and enforced [a cause of action] as a property right," Henry, 29 F.3d at 115. This caselaw suggests that it was not an error — at a minimum, not a clear and obvious plain error — to consider a cause of action to be property protected by the fraud statutes.

Neff and Hallinan's other responses are similarly unpersuasive. They cite cases "in other contexts [that have] concluded that there are no vested property interests in a cause of action before final judgment," Hallinan Br. 41, but they cite no authority suggesting that property rights must be vested for the fraud statutes to protect them. They also make a policy argument: that this theory transfigures "misstatements during civil litigation into a felony," Hallinan Br. 40, which "would have enormous ramifications in both the civil and criminal contexts," Neff Reply 24 n.9. But the fraud statutes are concerned with fraud — "false representations, suppression of the truth, or deliberate disregard for the truth." Third Circuit Model Jury Instructions § 6.18.1341-1. We reject the suggestion that "every civil litigant" commits fraud in the regular course of litigation. Hallinan Reply 16. Finally, the rule of lenity does not require a different conclusion: it controls "only if, after seizing everything from which aid can be derived, we can make no

15

more than a guess as to what Congress intended." Muscarello v. United States, 524 U.S. 125, 138 (1998) (alterations and quotation marks omitted). There is no such "grievous ambiguity or uncertainty" here. Huddleston v. United States, 415 U.S. 814, 831 (1974). Instead, "[v]aluable entitlements like these are 'property' as that term ordinarily is employed." Pasquantino, 544 U.S. at 356 (citing Leocal v. Ashcroft, 543 U.S. 1, 9 (2004) ("When interpreting a statute, we must give words their ordinary or natural meaning."), and Black's Law Dictionary 1382 (4th ed. 1951) (defining "property" as "extend[ing] to every species of valuable right and interest")). So, it was not a plain error to consider a cause of action to be "property" protected by the fraud statutes.

E.

Turning now to the defendants' individual arguments, Neff alone challenges the court's tribal-immunity instruction. The District Court told the jury that tribal sovereign immunity "protects federally recognized Indian tribes from being sued" such that "individual states do not have the authority to apply their laws to Indian tribes," but that it "does not provide a tribe or its members with any rights to violate the laws of any states" or "with any immunity from criminal prosecution." JA 5985–86. Neff argues that this instruction foreclosed a debatable question: whether an Indian tribe that lends money at usurious rates has engaged in the "collection of an unlawful debt" under RICO. Since he did not object on this basis in the trial court, we review only for plain error.

We see no plain error with respect to this instruction. RICO defines an unlawful debt as an unenforceable usurious one, and it looks to state or federal law to distinguish between enforceable and unenforceable interest rates. See 18 U.S.C. § 1961(6).

16

Sovereign immunity, on the other hand, is simply a "common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978). Tribal sovereign immunity thus limits how states can enforce their laws against tribes or arms of tribes, but, contrary to Neff's understanding, it does not transfigure debts that are otherwise unlawful under RICO into lawful ones. See, e.g., Neff Br. 16 ("Tribal Sovereign immunity made those loans lawful."). A debt can be "unlawful" for RICO purposes even if tribal sovereign immunity might stymie a state civil enforcement action or consumer suit (or even a state usury prosecution, although tribal sovereign immunity does not impede a state from "resort[ing] to its criminal law" and "prosecuting" offenders, Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 796 (2014)). The possibility of a successful state lawsuit is not an element of a RICO offense. And so the tribal-immunity instruction was not plain error.

F.

Neff also challenges the sufficiency of the Government's evidence against him. When assessing challenges to the sufficiency of the evidence, we ask only whether some rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. See, e.g., United States v. Shaw, 891 F.3d 441, 452 (3d Cir. 2018). The answer here is yes. For example, when Hallinan partnered with a new tribe in 2010, it was Neff who emailed the tribe to advise them that their payday-lending ordinance's cap on interest at a legally enforceable rate "would render the loan program unfeasible from the outset," U.S. Supp. App. 775, and would be "a deal killer, which would require us to

17

immediately move on to another tribe," JA 2979. And it was Neff who suggested rewriting the faux contracts to nominally grant the tribe the majority of payday-lending revenues to make the "optics" of them "much better" without changing the actual negligible percentage the tribe received, but warned that assigning the tribe the lion's share of the revenue "would seem bogus on its face," would "invite a further inquiry into the details," and "would be very suspicious to people." JA 3091, 3094–95. A rational factfinder could have concluded that Neff knowingly conspired to collect unlawful debts.

## G.

Neff's final challenge is to the District Court's loss calculation at his sentencing. The District Court found that the intended loss of Neff's fraud on the Indiana class-action plaintiffs was $10 million — but, finding this amount overstated the offense's seriousness, keyed the loss for purposes of the Guidelines to the $557,200 settlement offer instead. Neff argues that the Indiana plaintiffs did not actually lose $10 million, but that argument ignores that the District Court concluded "that the <u>intended</u> loss" — not the <u>actual</u> loss — "was $10 million," JA 7898, and that under the Guidelines the relevant "loss is the greater of actual loss or intended loss," U.S.S.G. § 2B1.1 note 3(A). And we see no clear error with the District Court's factual finding about the amount of loss Neff intended, which finds support in the record based on Neff's assertion in the June 2013 email about a possible $10 million award to the Indiana plaintiffs. See <u>United States v. Napier</u>, 273 F.3d 276, 278 (3d Cir. 2001). An error would have been harmless anyway, since the District Court used the settlement offer despite its intended-loss finding. <u>See, e.g.</u>, <u>United States v. Jimenez</u>, 513 F.3d 62, 87 (3d Cir. 2008).

18

We also reject Neff's contention that he intended no "loss" at all as that term is used in the Guidelines. He relies on our decision in United States v. Free, 839 F.3d 308, 323 (3d Cir. 2016), but there we merely rejected the "view that the concept of 'loss' under the Guidelines is broad enough to cover injuries like abstract harm to the judiciary." The "narrower meaning" of loss that we endorsed — "i.e., pecuniary harm suffered by or intended to be suffered by victims," id. — encompasses the loss in this case. So we will affirm the District Court's loss calculation.

H.

We now turn to Hallinan's individual challenges. He first contests the obstruction-of-justice enhancement applied at sentencing. See U.S.S.G. § 3C1.1. The District Court found that this enhancement applied to Hallinan due to the hiring of Mathewson (whom Hallinan paid) to assert privilege on behalf of Apex 1 — in the court's view, a defunct company that Hallinan claimed not to own, which would not have asserted privilege but for Hallinan's machinations — and his attempts to influence Mathewson after hiring her. This arrangement, the court concluded, amounted to "a sham organized to protect Hallinan, and to prevent the effective prosecution of this case." JA 8163. We review the factual finding that Hallinan willfully obstructed or attempted to obstruct justice for clear error. Napier, 273 F.3d at 278.

We are not left with the definite and firm conviction that a mistake has been made based on the facts and the reasonable inferences from them. See, e.g., United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007). The trial evidence laid bare Hallinan's relationship with Apex 1. His own testimony in the Indiana case was that he sold the

19

company to Ginger in 2008, he stopped being involved with it in 2009, and the company ceased doing business in 2010. Yet he funded and orchestrated its litigation defense in that case for years afterward, before eventually paying Ginger $10,000 a month to "step up to the plate" and assert ownership. JA 6391. It is a reasonable inference that Hallinan controlled Apex 1 through Ginger and that it was his decision to hire Mathewson to assert Apex 1's privilege in an attempt to impede the grand-jury investigation. Or, as the District Court put it at the August 2017 motions hearing, it was "abundantly clear that Apex's reason for its existence is only to assert this privilege." JA 326. Regardless of the validity of Apex 1's privilege assertions, the evidence is sufficient to conclude that the District Court's factual finding that Hallinan willfully obstructed or attempted to obstruct justice was not clearly erroneous.

## I.

Finally, we turn to Hallinan's challenges to the District Court's forfeiture order and calculation of the money judgment against him. Under 18 U.S.C. § 1963, RICO convictions carry mandatory forfeiture. The Government must prove the relationship between the property interest to be forfeited and the RICO violations beyond a reasonable doubt. United States v. Pelullo, 14 F.3d 881, 906 (3d Cir. 1994). Since the District Court conducted a bench trial on forfeiture after Hallinan waived his right to a jury trial, "we review [its] findings of facts for clear error and exercise plenary review over conclusions of law." Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R., 870 F.3d 244, 253 (3d Cir. 2017). Hallinan contests the forfeiture order and money judgment on three grounds. None is persuasive.

20

1.

First, Hallinan challenges the forfeiture of the funds in five bank accounts in his own name (identified as Properties 14–18 in the forfeiture order). The District Court found that "[t]he evidence at trial and at the forfeiture hearing establishes that the specific property listed as Properties 14 through 18 are funds received in bank accounts from Hallinan Capital Corp., which is part of the [RICO enterprise]," and so the properties "are forfeitable pursuant to 18 U.S.C. § 1963(a)(2)(A)." U.S. Supp. App. 622. Section 1963(a)(2)(A) provides: "Whoever violates any provision of section 1962 of this chapter . . . shall forfeit to the United States . . . any . . . interest in . . . any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962."

We see no clear error with the District Court's finding that the money in these accounts was a part of Hallinan's interest in the RICO enterprise. The Government offered the affidavit and testimony of a financial analyst to support this finding. That evidence showed deposits from accounts owned by Hallinan Capital Corporation (HCC) into each of these accounts. The court found the lowest balance in each account after the HCC deposits to be forfeitable enterprise funds. This finding is therefore supported by the record.

Hallinan does not dispute this evidence, but argues only that identifying his interest in the enterprise in this way contravenes our decision in United States v. Voigt, 89 F.3d 1050 (3d Cir. 1996). He is incorrect. In Voigt, we considered how to identify "property traceable to [tainted] property" under 18 U.S.C. § 982, not the "interest in . . .

21

any enterprise" under § 1963(a)(2)(A) or the meaning of "cannot be divided without difficulty" as used in substitute-asset provisions more broadly. While the RICO statute also requires that the Government proceed by way of the substitute-asset provision where property "has been commingled with other property which cannot be divided without difficulty," 18 U.S.C. § 1963(m)(5), the term "traceable to" appears nowhere in the statute. Rather, as we acknowledged in Voigt, "[t]he RICO forfeiture provision is by far the most far reaching" of the criminal-forfeiture provisions because it "is extremely broad and sweeping," encompassing forfeiture of "any interest the person has acquired or maintained in violation of [§] 1962, . . . any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over . . . any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of in violation of [§] 1962[,] . . . [and] any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity . . . in violation of section 1962." Voigt, 89 F.3d at 1083–84 (quotation marks omitted) (quoting 18 U.S.C. § 1963(a)(1)–(3)). The District Court's determination of Hallinan's interest in the RICO enterprise under § 1963 therefore did not run afoul of our decision in Voigt.[2]

---

[2] We acknowledge that the case on which the District Court relied also dealt with a different forfeiture provision with a different standard of proof. See United States v. Banco Cafetero Panama, 797 F.2d 1154 (2d Cir. 1986). But even if we were to conclude that the District Court erred, the error would probably be harmless, since the Government had the authority to seek forfeiture under the substitute-asset provision and provided Hallinan ample notice it would do so, and the District Court had already found that substitute assets would be proper. See United States v. Hallinan, No. 16-130-01, 2018 WL 3141533, at *5, *12–13 (E.D. Pa. June 27, 2018).

22

2.

Hallinan next argues that the District Court did not sufficiently exclude proceeds from the six states where payday lending is legal. This too is a factual finding that we review only for clear error. See Norfolk S. Ry. Co., 870 F.3d at 253.

To account for those states, the District Court excluded 4.79% of Hallinan's gross proceeds, which was the percentage of "leads" (or payday-loan candidates identified with online data) that came from those states. Hallinan concedes that "the government can use reasonable extrapolations to calculate illegal proceeds." Hallinan Br. 60. And he gives no reason to think that the percentage of legal leads is not a reasonable approximation of the percentage of legal loans. He does not show, for example, that a lead from Delaware was meaningfully more likely to become a loan than a lead from California. With no evidence disrupting the reasonable inference that lead states correlate to loan states, we cannot conclude that the District Court's factual finding was clearly erroneous.

Hallinan's counterarguments rest on the fact that very few leads became loans — only .15%. From this, he asserts that "it was over 99% certain that there was no correlation between leads and loans." Hallinan Br. 61. But the fact that few leads became loans says nothing about whether the distribution of leads among the states correlates with that of the loans. Hallinan also contends that "the small sample size of the leads also make[s] any correlation statistically insignificant." Id. But the Government analyzed all the leads and then offered the reasonable inference that the distribution among states would be the same for the loans, which Hallinan has not rebutted. It did not rely on a sample of leads at all. So there was no clear error.

23

Third, and finally, Hallinan contests the District Court's interpretation of what constitutes forfeitable RICO "proceeds" under 18 U.S.C. § 1963(a)(3). When determining Hallinan's RICO "proceeds," the District Court excluded "the costs the unlawful enterprise incurs as a result of performing the contracts" — that is, "the principal extended to borrowers" — but not the enterprise's "regular business expenses." U.S. Supp. App. 616–17 (emphasis omitted). Hallinan concedes that his "overhead such as office space, supplies, or taxes" is not deductible. Hallinan Br. 63. And the Government does not challenge on appeal the deduction of the principal of the loans (although it did before the District Court). See Gov. Br. 150 & n.53. The issue on appeal is a narrow one: whether the District Court was wrong not to deduct certain operational expenses — for example, "marketing, credit fees, and salaries," Hallinan Br. 63 — when determining the RICO "proceeds" to be forfeited under § 1963(a)(3). Whether the term "proceeds" in § 1963(a)(3) excludes these expenses is a question of law over which we exercise plenary review. See Norfolk S. Ry. Co., 870 F.3d at 253.

The District Court relied on the reasoning of the Court of Appeals for the Second Circuit in United States v. Lizza Industries, Inc., 775 F.2d 492 (2d Cir. 1985). There, the court endorsed "deducting from the money received on the illegal contracts only the direct costs incurred in performing those contracts." Id. at 498. It explained:

> Forfeiture under RICO is a punitive, not restitutive, measure. Often proof of overhead expenses and the like is subject to bookkeeping conjecture and is therefore speculative. RICO does not require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal acts

produced. RICO's object is to prevent the practice of racketeering, not to make the punishment so slight that the economic risk of being caught is worth the potential gain. Using net profits as the measure for forfeiture could tip such business decisions in favor of illegal conduct.

Id. at 498–99. In other words, the court interpreted "proceeds" in the RICO statute to mean gross profits — total revenues minus marginal costs, but not fixed costs.

The District Court did not err by adopting this reasoning to refuse to deduct the operational expenses such as marketing, credit processing, and collection fees from Hallinan's forfeitable RICO "proceeds." Our Court has not interpreted the meaning of "proceeds" in § 1963(a)(3), but many other Courts of Appeals have interpreted it to mean gross receipts — a broader definition than that adopted by the court in Lizza Industries and the District Court here. See, e.g., United States v. Christensen, 828 F.3d 763, 822 (9th Cir. 2015) ("We agree with the view that 'proceeds' in the RICO forfeiture statute refers to gross receipts rather than net profits."); United States v. Simmons, 154 F.3d 765, 770–71 (8th Cir. 1998); United States v. McHan, 101 F.3d 1027, 1041–43 (4th Cir. 1996); United States v. Hurley, 63 F.3d 1, 21 (1st Cir. 1995); cf. United States v. DeFries, 129 F.3d 1293, 1315 (D.C. Cir. 1997) (concluding that taxes paid on illegal profits should not be deducted from the calculation of RICO "proceeds"). Only the Court of Appeals for the Seventh Circuit has interpreted "proceeds" in § 1963(a)(3) more narrowly than the District Court to mean net profits. See United States v. Genova, 333 F.3d 750, 761 (7th Cir. 2003) (explaining that proceeds in § 1963(a)(3) means "profits net of the costs of the criminal business"); United States v. Masters, 924 F.2d 1362, 1369–70 (7th Cir. 1991). The District Court did not err by taking a more conservative view than that adopted by

25

the majority of the Courts of Appeals. Since the District Court excluded the principal of the loans and Hallinan does not contest the inclusion of his overhead and taxes, we need not and do not decide whether "proceeds" means, more broadly, gross receipts.

III.

For these reasons, we will affirm Neff's and Hallinan's judgments of conviction and sentence.